UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| FUSION LEARNING, INC. | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| ANDOVER SCHOOL COMMITTEE, | ) | |
| TOWN OF ANDOVER D/B/A ANDOVER | ) | |
| SCHOOL DEPARTMENT D/B/A ANDOVER | ) | |
| PUBLIC SCHOOLS, CLAUDIA BACH, | ) | |
| SUPERINTENDANT, SANDRA TRACH, ASST. | ) | |
| SUPERINTENDANT, and SHELDON BERMAN, | ) | |
| FORMER SUPERINTENDANT, | ) | |
| Defendants. | ) | |

_____)

## COMPLAINT AND JURY DEMAND

### Introduction

1. Plaintiff Fusion Learning, Inc. ("Fusion Academy") brings this action to redress violations of its rights under the Constitution and laws of the United States and the Commonwealth of Massachusetts.

2. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities secured by the First and Fourteenth Amendments to the Constitution of the United States, and other laws.

### Jurisdiction

3. Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(3) and, respecting the claims for declaratory relief, pursuant to 28 U.S.C. § 1367.

## Parties

4.    Fusion Academy is a corporation, incorporated under the laws of  Delaware, with its

       corporate headquarters and principal place of business in Grand Rapids, Michigan.

5.    The defendants are the Andover School Committee ("ASC"), Town of Andover d/b/a

       Andover School Department d/b/a Andover Public Schools (hereinafter "Town"),

       Superintendent Claudia Bach, personally, Assistant Superintendent Sandra Trach,

       personally, and former Superintendent Sheldon Berman, personally, all doing business in

       Andover, Massachusetts.

## Facts

### *Defendants' Background*

6.    The public educational system of Andover, Massachusetts is operated by a department of

       the Town under state statutes and regulations of the Massachusetts Department of

       Elementary and Secondary Education ("DESE"). The area or district served by the Andover

       Public Schools is coterminous with the Town of Andover.

7.    The ASC is the elected governing board of Andover's public educational system. Although

       it functions as an elected committee of town government, the ASC has autonomous

       authority, separate from other town agencies, to carry out the educational policies of the

       state.

8.    The Superintendent of Schools is appointed by vote of the ASC and reports directly to the

       ASC.

9.    The ASC appoints, upon recommendation by the Superintendent, Assistant Superintendents.

       Assistant Superintendents report directly to the Superintendent, not the ASC.

*Fusion Academy Background*

10. Fusion Academy owns and operates schools. Its schools are an alternative private option for parents of children in grades 6-12 who often struggle in traditional school settings. . As opposed to a typical Andover Public School classroom education, the educational experience at Fusion Academy is customized around each student and provides one student to one teacher instruction. Classes are individually paced for each student, and the material is presented in a way that takes into account each student's interests, strengths, and learning style.

11. Schools operated by Fusion Academy are accredited by, or have their accreditation pending from, all major national and regional educational accreditation agencies, including the New England Association of Schools and Colleges.

12. Fusion Academy operates over 60 campuses located in 17 states and the District of Columbia, including three in Massachusetts: Newton, Burlington and Hingham.

13. Fusion Academy's three Massachusetts campuses have been approved as private schools, pursuant to M.G.L.c. 76, § 1, also known as the Massachusetts Compulsory Education Law.

*Public Education in Massachusetts*

14. By statute and by regulations, primarily from DESE, the state prescribes in considerable detail how public schools are to be run.

15. Student learning time, including the length of a school day and year, structured learning requirements, such as core curriculum and course completion criteria, are uniform across all Massachusetts public schools.

16. To the best of Fusion Academy's knowledge, the instruction in studies required by law in the public schools of Burlington, Hingham and Newton equals in thoroughness and efficiency, and in the progress made therein, the instruction in the public schools of Andover.

*Non-Public Education in Massachusetts*

17. The statutory mechanism for approval to operate a private school in Massachusetts is M.G.L.c. 76, § 1, which vests authority in the school committee in whose district the private school is located. A school committee's approval under M.G.L.c. 76, § 1 means that Massachusetts children attending the private school may do so without violation of the compulsory attendance law.

18. In pertinent part, M.G.L.c. 76, § 1 provides that, "[f]or the purposes of this section, school committees shall approve a private school when satisfied that the instruction in all the studies required by law equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town; but shall not withhold such approval on account of religious teaching …."

19. DESE is the state agency that provides leadership, oversight, funding, support, and accountability for public school districts, including Andover.

20. The Commissioner of DESE has issued a memorandum entitled *Advisory on Approval of Massachusetts Private Schools Pursuant to Mass. Gen. Laws c. 76, § 1,* dated October 7, 2007 (hereinafter "DESE Advisory").

21. According to the DESE Advisory, "[s]chool committee approval is neither an *evaluation* of program quality nor an *endorsement* of any particular school. The decision to enroll a child

in, or to withdraw a child from, a particular private school is one that parents must make."

(Emphasis added.)

22. According to the DESE Advisory, DESE has no jurisdiction or authority over private schools and does not regulate them.

23. Because school committees are afforded discretion in developing their own review policies under M.G.L.c 76, § 1, DESE recommends that "Standards for Approval of Private Schools" be established by school committees and set forth in a written policy. "In order to assist private schools in its district, the school committee should have a written statement of policy and procedures by which it considers and acts upon private school applications for approval" to ensure that the school committee has "a private school review process that is open and reasonable."

24. The DESE Advisory further states that a school committee's written policy should address:

- the standard for private school approval under G.L. c. 76, § 1 ("equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town.");
- the procedures for school committee approval (application process, timetable, requested documentation, site visits, procedures for periodic review of approval status, etc.);
- other agency approvals that may be required (health, safety, building and fire inspections, etc.);
- the records and materials the school is required to maintain; and
- the criteria for measuring the "thoroughness and efficiency" of private school instruction in such areas as the program of studies and curriculum, student performance assessment procedures, the length of school day and school year, staff distribution and qualifications, textbooks and materials, maintenance of student records, and compliance with applicable federal and state laws.

25. The DESE Advisory also addressed a frequently asked question by school administrators and school committees:

**Q: Are any of the state mandates applicable to public schools made applicable to private schools by the phrase, "when satisfied that the instruction in all the**

**studies required by law equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town?"**

A: Various state laws set forth the subjects that public schools teach. See, for example, G.L. c. 71, §§ 1, 2 and 3; G.L. c. 69, § 1D. Generally, the "thoroughness and efficiency" language in G.L. c. 76, § 1, should not be interpreted as extending particular public school mandates regarding instruction and curriculum to private schools.

26. According to the DESE Advisory, M.G.L.c. 76, § 1, "requires that a school committee apply its policies and procedures *consistently* to all private schools located within its jurisdiction." (emphasis supplied)

27. In its Advisory, DESE includes "a sample of factors that a school committee may wish to consider in evaluating the 'thoroughness and efficiency' of the instruction offered by a private school." According to DESE, these "sample criteria are not mandatory, and the school committee may adopt or amend them in any *reasonable* way." (Emphasis added.)

28. State regulation of private schools is limited such that children may obtain instruction deemed valuable by their parents and which is not in conflict with any legitimate state interest.

29. Massachusetts does not require of private schools:

   a. registration, licensing and/or accreditation:

   b. teacher certification;

   c. length of school year;

   d. instruction or curriculum, including what courses shall or may be taught, how they should be taught and who may teach them; and

   e. student learning time, including structured learning time, in-person learning time, direct instruction, synchronous or asynchronous learning, on-line digital instruction, or remote learning.

30. Eligible students with learning disabilities in Massachusetts who attend private school at private expense are entitled to special education designed to meet their needs. Such students are entitled to an individualized education program (IEP). These services are provided or arranged for, and paid by, the public school district in which the student resides, not the private school.

31. As described in another DESE advisory (SPED 2018-1), public school districts have an obligation to locate and evaluate students with disabilities enrolled by their parents in private schools located within the district, regardless of district of residency, and to calculate and spend a proportionate share of federal special education (Individuals with Disabilities Education Act or IDEA) grant funds providing equitable services for these students.

32. In Massachusetts, parents who disagree with an IEP that public school officials have designed, may withdraw their child from the public school, enroll her or him at private expense in a private school they deem to be a necessary and appropriate IEP placement, and, if shown to be right in this regard, seek partial or full tuition reimbursement from the public schools.

33. In Massachusetts, as in the rest of our country:

    a. Parents have a constitutional right to send their children to private schools . Runyon v. McCrary, 427 U.S. 160, 178 (1976). Private schools have a First Amendment right to academic freedom. Asociacion de Educacion v. Garcia-Padilla, 490 F.3d, 1, 11 (1st Cir. 2007).

    b. The liberty of parents or guardians to direct the upbringing and education of their children is a right guaranteed by the Constitution and it may not be abridged by state or local action which has no reasonable relation to some

purpose within the competency of the state. <u>Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,</u> 268 U.S. 510, 534-535 (1925).

c.  The liberty interests protected by the First and Fourteenth Amendments extend to activities involving child education.

d.   The discretion of the states and local school boards must be exercised in a manner that comports with the transcendental imperatives of these amendments.

e.  Our nation is deeply committed to safeguarding educational freedom, which is of transcendent value under the First Amendment.  <u>Keyishian v. B'd of Regents</u>, 385 U.S. 589, 603 (1967).  The term educational freedom encompasses the freedom of educational institutions to pursue their ends without interference extending beyond the state's limited interest in ensuring *an* education for its children.  <u>Asociacion de Educacion v. Garcia-Padilla</u>, 408 F. Supp. 2d 62, 69 (D.P.R. 2005).

f.  Educational freedoms include the right of a private school to determine for itself how subjects shall be taught. <u>Sweezy v. New Hampshire</u>, 354 U.S. 234, 262 (1957), Frankfurter, J. concurring. They guarantee to a private school under the First Amendment the right to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study. <u>Asociacion de Educacion v. Garcia-Padilla</u>, 408 F. Supp. 2d 62, 69 (D.Mass. 2005).

g.  Educational freedom is based upon the exclusion of governmental intervention in the intellectual life of educational institutions. <u>Sweezy, *supra*</u>. It includes not merely liberty from restraints on thought, expression and association in the academy, but also the idea that schools should have the freedom to make decisions about *how* and *what* to teach.  <u>B'd of Regents v. Southworth</u>, 529 U.S. 217, 237 (2000).

34. The approval process prescribed in M.G.L. c. 76 § 1 requires that the applicant have an opportunity to explain its proposal and present witnesses. If the proposal is rejected, the applicant must be given the chance to revise its proposal to remedy identified inadequacies.

35. Alleged inadequacies that are not fact-based cannot justify rejection of the application.

36. M.G.L. c. 76, § 1 ensures that "all children shall be educated, not that they shall be educated in any particular way." Comm. V. Roberts, 159 Mass. 372, 374 (1893).

37. Under M.G.L.c. 76, § 1, a school committee does not have the power to require that children "be educated in a certain way at a certain place." Care and Protection of Charles, 399 Mass. 324 (1987) (citing Appeal of Peirce, 122 N.H. 762, 768 (1982)).

38. Approval of home school applications and private school applications are to be treated under the same standard, set forth in M.G.L. c. 76, § 1.

*ASC Policy Respecting Nonpublic Schools*

39. The published policy of the ASC respecting the approval process for a nonpublic school consists of a one sentence paraphrase of M.G.L. c. 76, § 1: "In accordance with state law, the School Committee will approve a private school when it is satisfied that the instructional program of the school equals that of the town's public schools in thoroughness, efficiency, and progress made."

40. The policy offers no timetable for the application process to unfold so that any plan for opening the private school's doors is subject to the whim of the ASC.

41. The policy, contrary to the DESE Advisory, does not set forth any standards, policies or procedures for approval of a private school application, including, but not limited, to the criteria for measuring the "thoroughness, efficiency and progress made" of private school instruction.

42.   For example, the policy does not inform an applicant of or whether:

    a.   any of the sample factors set forth in the DESE Advisory would be considered or otherwise utilized by the ASC in its review;

    b.   the approval process would be iterative or non-iterative;

    c.   the required documentation, e.g. data on teacher retention rates and teacher experience;

    d.   evidence of other agency approvals, such as health, building, fire, are required at the time of application;

    e.   required non-teaching staff, such as nurses, psychologists, social workers;

    f.   the applicant would have an opportunity to present supporting witnesses at a hearing;

    g.   the applicant would have an opportunity prior to a vote to correct gross mistakes of fact in any analysis of the application provided to the ASC;

    h.   non-academic positions such as nursing would need to be in place prior to submission of the application for approval or only prior to actual operation of the school;

    i.   use of a "draft" job description for a non-academic position would be a negative;

    j.   evidence of NCAA approval of courses would be necessary;

    k.   the particular uses to which music and art rooms would be put needed to be described, it being evident that each would be used for some type of learning related to the room name;

    l.   computer programs for lesson planning by teachers, for student learning, for parent communication and for administrative functions such as recordkeeping, scheduling

and transcript exchanges, would need to be provided prior to any hearing on the application;

m.  the applicant should have on staff, rather than rely on outside professionals, a robust range of individuals to attend to students with disabilities;

n.  the applicant's teachers must have a bachelor's degree, a master's degree, a state license or other, similar qualifications;

o.  the absence of a faculty/staff directory at the time of submission of the application would be regarded as a negative, notwithstanding the fact that the application might languish for a year;

p.  an applicant's purported failure to comply with DESE's "Student Learning Time" regulations, including those for structured learning time and in-person instruction, would result in non-approval even though DESE expressly has stated these regulations do not apply to private schools;

q.  an applicant must comply with the defendant Town's traditional school model as a condition of approval;

r.  small class size would be an important consideration, as suggested by the defendant ASC's public statement that: "smaller class sizes enable teachers to provide more personal attention to students;" "class size matters, particularly when teachers are able to alter or adjust their instruction to better address individual needs;" and "[m]uch of our professional development … has focused on that kind of differentiated and targeted attention to individual students;"

s.  the applicant must provide special education services and/or teachers;

t.    offering enrollment to families of students who may have learning disabilities or an IEP Plan, would be a factor against approval, as the defendant ASC Chairwoman Shannon Scully stated on March 25, 2021;

u.    the ASC interprets the "thoroughness and efficiency" language in M.G.L. c. 76, § 1 as extending public school mandates regarding instruction and curriculum to private schools, notwithstanding DESE's advisory to the contrary;

v.    the ASC, contrary to the DESE Advisory, interprets approval of a private school's application to be an endorsement of the school.

43.    The ASC policy respecting non-public schools is impermissibly vague under the Fourteenth Amendment.

44.    This effective absence of an ASC policy permitted the defendants Town, Bach, Trach and Berman to create their own unpublished policies, procedures and standards of review for Fusion Academy's application, to Fusion Academy's detriment.

45.    It also permitted the defendants to slow-walk the application process as a means of destroying Fusion Academy's interest in operating a private school in Andover.

46.    On information and belief, four private schools currently operate, and at all times relevant to this complaint have operated, within the town. Notwithstanding the recommendation of DESE, the ASC does not have any policy or procedure for periodic review of their approval status and has not performed any such review.

47.    In recommending denial of and/or in denying Fusion Academy's applications, all defendants applied to Fusion Academy public school mandates that they have not applied to those private schools.

48. On belief, the ASC has approved home school applications pursuant to the existing ASC nonpublic school policy.

49. Although the defendants acknowledge that private school applications and home school applications are to be approved based on the same standards, Fusion Academy believes that the defendants have not applied to home school applications the same standards as were applied to its private school applications.

50. At all relevant times, defendants acted under a badge of state authority, M.G.L.c. 76, § 1.

51. The deprivations of Fusion Academy's rights were caused by defendants' exercise of authority pursuant to M.G.L.c. . 76, § 1, and the defendants' policy issued pursuant thereto.

*Fusion Academy's First Application*

52. On May 29, 2018, Fusion Academy submitted its first application to operate a private school. As of that date, it was already operating approximately 46 schools in various states.

53. The ASC policy contained no timetable for consideration of the application and the ASC offered none at that time or at any other time.

54. The defendant ASC designated the defendants Town, Trach and Berman to review Fusion Academy's first application and make a recommendation on approval to the ASC.

55. Over the ensuing several weeks, the defendants made it a pre-condition to completion of the application review process and approval that Fusion Academy secure a certificate of occupancy for physical facilities within which to operate its proposed school.

56. Therefore, in September 2018, Fusion secured a school site in Andover pursuant to a written lease of ten (10) years and six (6) months with a cumulative lease obligation over those years of $2,584,082.48.  Promptly after signing the lease, it had performed a complete build-out of the campus at a cost of more than $1,400,000.

57.  Over a year later, on April 11, 2019, the ASC denied the application. It did so in reliance on the recommendation of defendant Trach and her April 10, 2019 written recommendation not to give approval ("2019 Recommendation"), and the concurrence in her recommendation by the then superintendent, defendant Berman.

58.  The defendants Town, Trach and Berman all purportedly relied on the DESE Advisory in reviewing the application and in making their recommendations to the defendant ASC to deny Fusion's application.

59.  At the April 11, 2019 hearing on Fusion's application, the defendant Berman told the ASC that he agreed with Trach's recommendation because, "we have to make a clear distinction that this is as thorough and efficient as our education. In essence, when a school district says yes, they are in essence endorsing a program and at this point I do not feel I can have the confidence based on this assessment that the district can endorse the program as a private school that would essentially be equivalent and giving the same diploma as AHS so I would concur with Sandys rec."

60.  Defendant Berman made this statement, knowing that approval of an application is not an endorsement of the private school.

61.  The 2019 Recommendation was based, *inter alia*, on the fact that the Fusion Academy teaching model relies upon fewer teacher-led instructional hours than in Andover public schools and a ratio of one student to one teacher during those hours in comparison to a ratio of 25 to 30 students and one teacher at the Andover public schools.

62.  The 2019 Recommendation declared these two methods "in no way comparable," implicitly denouncing the Fusion Academy model.

63. The defendants, in rejecting the application, treated an hour of 1-to-1 learning to be identical in thoroughness and efficiency to an hour of 25-to-1 learning even though they have publicly articulated the view that "smaller class sizes enable teachers to provide more personal attention to students;" "class size matters, particularly when teachers are able to alter or adjust their instruction to better address individual needs;" and "[m]uch of our professional development … has focused on that kind of differentiated and targeted attention to individual students."

64. The 2019 Recommendation declared that Fusion Academy's application "may impact a student's application and preparation for higher education," a criterion not found in the ASC policy, in the DESE Advisory or any other source known to Fusion Academy.

65. The 2019 Recommendation stated that Fusion Academy "acknowledges that it will not have a nurse on site," a requirement not to be found in any ASC policy and not within the items listed in M.G.L. c. 76, § 1 for consideration by a school committee.

66. It went on to observe that, in the absence of an on-site nurse, Fusion Academy would "have no option but to decline to admit or terminate" certain students, which would, so it opined, constitute discrimination on the basis of disability. It also drew a false conclusion that the absence of an on-site nurse would require Fusion Academy to decline admission to students with certain medical needs.

67. Nothing in M.G.L.c. 76, § 1 suggests that a school committee is the appropriate municipal body to police anti-discrimination policies, which many federal, state and municipal organizations have legislative mandates to oversee.

68. The 2019 Recommendation noted, accurately in this instance, that Fusion Academy expected to admit students who had not thrived in traditional school environments and that

Fusion will not seek recognition from the state as a licensed private special education school. It then observed that the application failed to set out how it would support the "social, emotional, and behavioral needs (e.g., psychological services, counseling, social work, nursing etc.)" of such students, a criterion not spelled out in the ASC policy on nonpublic school approval.

69. As the 2019 Recommendation then misleadingly concluded, "despite targeting students with social/emotional challenges for admission, Fusion will be unable to meet the social, emotional, and behavioral needs of said students due to inadequate staffing…."

70. Aside from mischaracterizing the student population targeted by Fusion Academy, this passage omitted the central fact that public school districts have an obligation to locate and evaluate students with disabilities enrolled by their parents in private schools located within the district, and to calculate and spend a proportionate share of federal special education (Individuals with Disabilities Education Act or IDEA) grant funds providing equitable services for these students. DESE Revised July 2018 Administrative Advisory SPED 2018-1.

71. Students with disabilities who are entitled to an individualized educational program (IEP) and who attend private school at private expense are entitled to special education funding with federal, state and local monies designed to meet their needs. If the student is a resident of Andover, the services would have to be provided or arranged for by the defendant Town, not Fusion Academy.

72. The defendants Town, Trach and Berman did not include this information about the Town's obligation in the 2019 Recommendation. Nor did they include it in the presentation to the ASC during the hearing on the application.

73. On information and belief, this aspect of the 2019 Recommendation was meant as a signal to the ASC that Fusion Academy, if approved as a private school, would siphon away from the public school system federal and state funds dedicated to special needs students.

74. The basis for Fusion Academy's belief is not only the language of the 2019 Recommendation but also the statement of the defendant Berman, on June 19, 2019 and again in August 2020, that one of the reasons Fusion Academy was not and would not be approved as a private school is because some of the Town's special needs education funding from the state and federal governments could be reallocated to Fusion.

75. On June 19, 2019, defendant Berman also told Fusion Academy representatives that when it comes to special education funding, he was not worried about Phillips Academy asking for special needs' money – "they don't ask for a dime from us—they have a huge endowment."

76. There is no statutory or DESE authority allowing for consideration of federal and state special education funding and/or cost sharing requirements as a factor in private school approval under M.G.L.c. 76, § 1.

77. The 2019 Recommendation criticized the absence of any licensing requirement for teachers at Fusion Academy even while noting that "there is no state policy for teacher licensure for private schools." It neglected to add that the ASC policy likewise has no such requirement.

78. In a similar vein, it noted the public schools' teacher orientation programs, teacher experience levels and teacher retention rate, criteria for approval not mentioned in any policy, standard, law, regulation or advisory. It then urged disapproval of the application because of "Fusion's failure to provide data regarding teacher turnover rates, subject matter expertise, or its policy regarding teacher preparation time." Left unsaid was that such data was not called for by the ASC policy on approval.

79. The conduct of the hearing deprived Fusion Academy of its right to be heard.

80. The denial of the first application deprived Fusion Academy of its rights, including but not limited to its right to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.

*Fusion Academy's Second Application*

81. At the time of the ASC's denial on April 11, 2019, and during subsequent conversations, members of the ASC told Fusion Academy that if it addressed defendant Trach's criticisms of its first application, principally located in the 2019 Recommendation, there would not be any reason to disapprove a second application.

82. Fusion Academy, therefore, spent a year reworking its application in a way that addressed the alleged weaknesses there articulated.

83. On or about May 14, 2020, it resubmitted its application.

84. Even though it was not obligated to do so, Fusion Academy's second application complied with DESE's "Student Learning Time" regulations and, in particular, "full-time in-person learning" and "structured learning time" requirements.

85. As with its first application, Fusion Academy had no timetable by which to measure the progress of the review process.

86. The defendant ASC designated the defendants Town, Trach, Berman and Bach to review Fusion Academy's second application and make a recommendation on approval to the ASC.

87. On March 25, 2021, the ASC, based on the recommendations of the defendants Town, Bach and Trach ("2021 Recommendation"), again denied Fusion's application.

*The Review Process of the Second Application*

88.  In the ten months between the date of submission and March 16, 2021, despite repeated
     inquiries by Fusion Academy representatives as to the timeline for review, and despite
     numerous offers to provide any missing information, documentation or assistance and/or to
     discuss any areas of concern, the defendants provided no substantive feedback.

89.  On March 16, 2021, the ASC publicly posted the agenda for its March 18, 2021 meeting.
     Fusion Academy's application was listed as a discussion item. Fusion Academy had had no
     prior notice of this event.

90.  The ASC addressed Fusion's second application at its March 18, 2021 meeting. At no time
     prior to this meeting had any of the defendants informed Fusion of any concerns with or
     deficiencies in its second application.

91.  The ASC has a policy that " feedback on posted agenda items is encouraged at business
     meetings *in order to inform decisions*. Typically, the public is asked to wait until the
     meeting comes to each particular agenda item to hear feedback on it as part of the
     discussion." (Emphasis added.)

92.  At the March 18, 2021 meeting, when Fusion Academy's application came up as an agenda
     item, Fusion Academy representatives were not allowed to participate in the ASC's
     discussion about the application. Fusion Academy representatives were not permitted to
     respond to the comments and testimony of defendants Trach, Bach and Town.

93.  At the March 18, 2021 ASC meeting, defendant Trach stated that student learning time
     raised questions as to whether Fusion rises to the equivalency of the public schools. She
     incorrectly told the ASC that Fusion did not comply with DESE regulations for structured
     learning time and student learning time.

94. Defendant Trach also commented on how she had not been given access to Fusion's digital learning platforms without telling the ASC that she had never requested access nor responded to Fusion's inquiries of what else it could provide to her.

95. At the March 18, 2021 ASC meeting, defendant Trach also misled the ASC in response to one of their questions respecting special education and IEP responsibility. She indicated that these were areas for which Fusion was responsible when, as she knew or should have known, the defendant Town is legally and financially obligated to provide for and oversee such services for students in private schools located in the district.

96. The conduct of the hearing deprived Fusion Academy of its right to be heard.

97. On March 23, 2021, at approximately 3 PM, the defendant ASC posted its agenda for its March 25, 2021 meeting. Fusion's application was listed as a vote item for hearing. No written report was posted with the agenda on March 23, 2021, although the defendants had stated at the March 18 meeting that defendant Trach intended to create a written report.

98. On March 24, 2021, at about mid-day, the public agenda had been changed on the ASC's website to include a memorandum from defendant Trach to the defendant Bach, dated March 23 ("2021 Recommendation"). The memorandum, 15 pages long, recommended that the ASC deny Fusion's application.

99. Fusion Academy, having about 30 hours to react, submitted a response letter to the ASC approximately 1 hour before the scheduled meeting on March 25, 2021.

*Denial of the Second Application*

100. At the March 25, 2021 meeting, Fusion Academy representatives again were not permitted to speak or address ASC questions during the hearing when its application came up as an

agenda item. Fusion Academy representatives were not permitted to respond to the comments and testimony of defendants Trach, Bach and Town.

101. As at the March 18 meeting, they were restricted to addressing the 2021 Recommendation during the general, public comment session prior to the start of the actual hearing on its application. Although Fusion Academy had specifically asked that its response letter be read during the hearing on its application, the ASC refused to do so.

102. The conduct of the hearing deprived Fusion Academy of its right to be heard.

103. At this meeting, the ASC denied the application, 4-1. The stated reason was the recommendation of defendant Trach, contained in her written recommendation, which defendant Bach endorsed.

104. As with the 2019 Recommendation, the 2021 version treated an hour of 25-to-1 learning as identical in thoroughness and efficiency to an hour of 1-to-1 learning, even though the defendants themselves have publicly articulated the view that "smaller class sizes enable teachers to provide more personal attention to students;" "class size matters, particularly when teachers are able to alter or adjust their instruction to better address individual needs;" and "[m]uch of our professional development … has focused on that kind of differentiated and targeted attention to individual students."

105. The 2021 Recommendation erroneously stated that the application does not comply with public school student learning time regulations because Fusion Academy's "self-study digital learning module does not meet the student learning requirement for in-person instruction."

106. The 2021 Recommendation erroneously stated that a single Fusion course would have only 23 hours of in-person instruction with a teacher. The defendant Trach refused to disclose

that the digital instruction sessions at Fusion Academy occurred on campus and were teacher supervised rather than being remote, self-study, digital sessions.

107. At the March 25, 2021 hearing on Fusion Academy's application, the defendant Trach erroneously told the ASC that Fusion Academy's digital instruction sessions do not satisfy student learning time regulations because they are not considered "full-time in-person learning" pursuant to DESE Commissioner's Directive dated March 9, 2021. In fact, Fusion Academy's digital instruction sessions do fit within the DESE definition of "full-time in-person learning." Her erroneous premise gave her license to conclude that because Fusion Academy does not comply with Massachusetts student learning time regulations in this respect, "this is precisely where Fusion Academy's application falls short" and should be denied.

108. Setting aside the inapplicability of public-school mandates, defendant Trach's statements could not have been made in good faith by anyone who had read relevant DESE regulations.

109. The defendants Town, Bach, and Trach misled the ASC respecting Fusion's purported non-compliance with DESE's student learning time regulations with the intent to have the ASC deny Fusion's resubmitted application.

110. Since the ASC must have known, regardless of defendant Trach's misrepresentations, that public school requirements such as student learning time are inapplicable to private schools, its use of this criterion deprived Fusion Academy of its rights.

111. The four ASC members who voted to deny the resubmitted application stated that a major consideration was Fusion's purported non-compliance with the student learning time regulations as articulated by the defendant Trach and endorsed by the defendant Bach.

112. The one ASC member who voted in favor of Fusion Academy, Paul Murphy, is the only professional educator on the committee, having taught mathematics at Phillips Academy, a private school in Andover, since 1988 and having served in several administrative capacities, including cluster dean, and dean of students and residential life.  He developed Phillips Academy's first fully online geometry courses in 2017.

113. At the hearing on March 25, 2021, Mr. Murphy stated that the ASC application review process has major flaws in it—the committee cannot determine equivalency between a traditional bricks and mortar school and a 1-to-1 school model.

114. Mr. Murphy made the following comments respecting the 2021 Recommendation:

    a. how does a private school come into any town and offer a different means of instruction: 1-on-1 is so different from traditional classroom instruction—it is apples to oranges;

    b. "making the same progress" can't be measured [because Fusion Academy is not up and running] but likely has occurred in other towns [where Fusion Academy operates];

    c. what Ms. Trach is referring to as asynchronous takes place inside Fusion Academy and is not remote;

    d. remote learning works for some kids;

    e. asynchronous learning clearly helps some kids and has made major steps forward;

    f. everything depends on the child and the family;

    g. evidence is that different kids learn in different ways; and

    h. asynchronous instruction is a great tool for talented teachers. It is teacher-supervised at Fusion Academy and I would consider that Fusion would do it well.

115. The 2021 Recommendation was critical of the second application because notwithstanding the absence of any ASC policy regarding plans in "draft" form or requirements surrounding nurses generally and notwithstanding the absence of any request for a "final" version, Fusion Academy's plan for nursing coverage was embodied in a draft contract rather than a fully executed one.

116. The 2021 Recommendation reported that "there was no evidence to comprehensively evaluate" Fusion Academy's statement that its instructional units meet state requirements for public school. Since state law, state regulation and ASC policy on private school approval do not require an application to provide evidence "to comprehensively evaluate" the statement, it is not surprising that the defendant Trach could make this statement. Why she did not, over a 10-month period, ask for additional "evidence" is confounding.

117. The 2021 Recommendation complains that the defendants were not given access to certain digital platforms in use at Fusion Academy. Since the ASC policy on approval of private school applications did not list such access as a matter of interest and since no defendant requested access, the report, while true, confirms that Fusion Academy was denied fundamental rights. No defendant prior to the March 18, 2021 ASC meeting ever raised any questions or concerns respecting digital platforms.

118. The 2021 Recommendation lists as another reason for denial that the length of a course at Fusion Academy may vary in response to a student's pacing needs. The defendants themselves, for their own schools, have told their constituents that "[m]uch of our professional development … has focused on … differentiated and targeted attention to individual students." Why such differentiation is good for the schools overseen by the defendants but bad for Fusion Academy is confounding.

119. The 2021 Recommendation returns to the theme of special needs students who are eligible for an IEP. It repeats the same charge as in the 2019 Recommendation, namely that Fusion Academy "is not equipped" to deal with such students and so will need to turn to outside providers. It failed to explain, again, that it is the legal and financial obligation of the defendant Town to provide for and oversee special education services for parents who choose to enroll their children in Fusion Academy and that federal and state funds are available in such a situation.

120. The defendants at all relevant times were aware that approval of Fusion Academy's application likely would result in restrictions on how the defendants could spend federal and state special education funds available to the public schools, and that the town budget might, under some circumstances, have to contribute more funds to satisfy the Town's legal obligation in support of special needs students whose parents chose to enroll them in Fusion Academy.

121. At the March 25, 2021 hearing, the ASC Chairperson, Shannon Scully, stated that it was "a giant red flag" for her that Fusion Academy was targeting special education families. Besides being factually incorrect, it is further support for Fusion Academy's belief that its application was not and, without judicial intervention, will not, be approved because some of the Town's special needs education funding from the state and federal governments could be reallocated to Fusion.

122. The conduct of the hearing deprived Fusion Academy of its right to be heard.

123. The denial of the second application deprived Fusion Academy of rights, including, but not limited to, its right to determine for itself on academic freedom grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.

124. The defendants' construction and application of M.G.L.c. 76, § 1, unreasonably infringes upon the rights of Fusion Academy guaranteed by the First and Fourteenth Amendments.

125. The actions by defendants exceed mere regulation of non-public schools where children obtain instruction deemed valuable by their parents and which is not in conflict with any legitimate state interest.

126. The defendants' construction and application of M.G.L.c. 76, § 1, is arbitrary, capricious and without reasonable relation to any end within the competency of the state.

127. The conduct, actions, inactions and omissions of the defendants Trach, Bach and Berman violated clearly established rights guaranteed by the Constitution of the United States, of which they knew or which a reasonable person in the defendants' positions should have known.

128. Defendants have unlawfully destroyed/deprived/interfered with Fusion Academy's liberty, business and property.

## COUNT I

129. The allegations of paragraphs 1 through 128 are repeated and incorporated herein.

130. The policies, actions, failures to act and omissions of the defendants while acting under color of state law have deprived Fusion Academy of its rights, privileges and immunities secured by the First and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. §1983.

131. As a result, Fusion Academy has suffered damages.

## COUNT II

132. The allegations of paragraphs 1 through 131 are repeated and incorporated herein.

133. Fusion Academy has a right and intends to submit another application to the ASC pursuant to M.G.L. c. 76, § 1.

134. Pursuant to 28 U.S.C. § 2201, Fusion Academy is entitled to a declaration that its first application satisfied the requirements of M.G.L. c. 76, § 1.

135. Pursuant to 28 U.S.C. § 2201, Fusion Academy is entitled to a declaration that its second application satisfied the requirements of M.G.L. c. 76, § 1.

## PRAYERS FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

a. Award compensatory damages in an amount to be determined at trial;

b. Award interest, costs and attorneys' fees;

c. Declare that Fusion Academy's first application to the Andover School Committee satisfied the requirements of M.G.L. c. 76, § 1 for the operation of a private school;

d. Declare that Fusion Academy's second application to the Andover School Committee satisfied the requirements of M.G.L. c. 76, § 1 for the operation of a private school;

e. Award such other relief as is just or equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff Fusion Learning, Inc hereby demands a trial by jury on all issues so triable.

Fusion Learning, Inc.

By its attorneys,

/s/Joseph J. Wadland
/s/James L. Ackerman
/s/Lawrence J. Mullen
Joseph J. Wadland, BBO No. 548531
Email:  jwadland@wadacklaw.com
James L. Ackerman, BBO No. 011650
Email:  jackerman@wadacklaw.com
Lawrence J. Mullen, BBO No. 360310
Email:  lmullen@wadacklaw.com
Wadland & Ackerman
Two Dundee Park, Suite 102
Andover, MA  01810
Tel. (978) 474-8880

Dated: June 28, 2021