UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FUSION LEARNING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-11059-MJJ |
| | ) | |
| ANDOVER SCHOOL COMMITTEE, | ) | |
| TOWN OF ANDOVER D/B/A ANDOVER | ) | |
| SCHOOL DEPARTMENT D/B/A ANDOVER | ) | |
| PUBLIC SCHOOLS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

July 3, 2025

JOUN, D.J.

Plaintiff Fusion Learning, Inc. ("Fusion"), a for-profit entity operating private schools for grades 6–12, alleges constitutional and statutory violations arising out of denials of its applications to open a private school in Andover, Massachusetts. Specifically, on January 18, 2023, Fusion filed a second amended Complaint pursuant to 42 U.S.C. § 1983 against the Andover School Committee ("ASC") and the Town of Andover (the "Town") (together, "Defendants") (Count I). [Doc. No. 54 at ¶¶ 5, 179–81]. Fusion also alleges violations of Title II of the Americans with Disabilities Acts of 1990 ("ADA") (Count II), and that Defendants violated its rights to equal protection, academic freedom, and due process by twice denying its applications to operate a private school in Andover. [*Id.* at ¶¶ 179–88]. It further seeks a declaration pursuant to 28 U.S.C. § 2201 that its applications satisfied the requirements of

M.G.L. c. 76, § 1 (Count III). [*Id.* at ¶¶ 191–92]. Before the Court are the parties' cross-motions for summary judgment. [Doc. Nos. 98, 115]. Defendants also filed two Motions to Strike. [Doc. Nos. 118, 119]. The matter was fully briefed, and a hearing was held on October 31, 2024. [Doc. No. 134]. For the reasons set forth below, Fusion's Motion for Summary Judgment is DENIED; Defendants' Motion for Summary Judgment is GRANTED as to the First Amendment and ADA claims but is otherwise DENIED. Defendants' Motions to Strike are DENIED without prejudice.

I.    BACKGROUND

A.  **The ASC And The Town Of Andover**

The public education system of the Town of Andover, Massachusetts (the "Town") is operated by a department of the Town under state statutes and regulations of the Department of Elementary and Secondary Education ("DESE"). [Doc. No. 117 at ¶ 40]. The Andover School Committee ("ASC") is an elected five-member governing board of Andover's public educational system. [*Id.* at ¶ 41; Doc. No. 129 at ¶ 435]. Although it functions as an elected committee of town government, the ASC has autonomous authority, separate from other town agencies, to carry out the educational policies of the state. [*Id.*]. The area or district served by the Andover Public Schools is coterminous with the Town of Andover. [Doc. No. 117 at ¶ 40].

The Superintendent of Schools is appointed by vote of the ASC and reports directly to the ASC. [Doc. No. 117 at ¶ 42; Doc. No. 129 at ¶ 437]. Assistant Superintendents report directly to the Superintendent, not the ASC. [Doc. No. 117 at ¶ 43; Doc. No. 129 at ¶ 438]. At all relevant times, the Superintendent was Dr. Sheldon Berman ("Dr. Berman") or Dr. Claudia Bach ("Dr. Bach"), who succeeded Dr. Berman as acting Superintendent as of January 1, 2021. [*Id.*]. At all relevant times, Sandra Trach ("Trach") was Assistant Superintendent for Teaching and Learning during Fusion's two applications. [Doc. No. 129 at ¶ 439].

## B.  The Statutory Framework And DESE Advisory

The statutory framework for approval to operate a private school in Massachusetts is Mass. Gen. Laws c. 76, § 1, which vests authority to approve a private school in the local school committee in whose district the private school is located. [Doc. No. 129 at ¶ 429]. On or about October 7, 2007, the Commissioner of DESE issued an advisory titled "Advisory on Approval of Massachusetts Private Schools Pursuant to M.G.L. c. 76, § 1" (the "DESE Advisory"), which contains a sample of factors that a school committee may consider when evaluating a private school application. [Doc. No. 117 at ¶ 62; Doc. No. 129 at ¶ 430]. Because school committees are afforded discretion in developing their own review policies under M.G.L. c. 76, § 1, DESE recommends that "Standards for Approval of Private Schools" be established by school committees and set forth in a written policy. [Doc. No. 117 at ¶ 64].[1]

## C.  ASC Policy

ASC has its own Policy LBC-Relations with Nonpublic Schools ("ASC Policy"), which states:

> In accordance with state law, the School Committee will approve a private school when it is satisfied that the instructional program of the school equals that of the town's public schools in thoroughness, efficiency, and progress made.

---

[1] The DESE Advisory further states that a school committee's written policy should address:
- the standard for private school approval under G.L. c. 76, § 1 ("equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town.");
- the procedures for school committee approval (application process, timetable, requested documentation, site visits, procedures for periodic review of approval status, etc.);
- other agency approvals that may be required (health, safety, building and fire inspections, etc.);
- the records and materials the school is required to maintain; and
- the criteria for measuring the "thoroughness and efficiency" of private school instruction in such areas as the program of studies and curriculum, student performance assessment procedures, the length of school day and school year, staff distribution and qualifications, textbooks and materials, maintenance of student records, and compliance with applicable federal and state laws.

[Doc. No. 117 at ¶ 65].

3

The Committee recognizes that many worthwhile contributions are made to this community by parochial and other private schools. Therefore, it will cooperate with these schools in matters of mutual benefit when law does not expressly prohibit this cooperation.

[Doc. No. 105-30]. The ASC Policy references M.G.L. c. 40, § 4E; M.G.L. c. 71, § 71D; M.G.L. c. 71B, § 4 –7A; M.G.L. c. 76, § 1. [*Id.*].

### D. **Fusion Academy And Current Private Schools In The Town**

Fusion Academy is a proposed for-profit private school for grades six through twelve (6-12) in Andover, Massachusetts. [Doc. No. 117-3 at 3, 8; Doc. No. 129 at ¶ 394]. In a letter to Dr. Berman, Fusion wrote, "Fusion Academy is built to connect with kids who feel disconnected and uninspired in a conventional environment . . . Each student is unique: some learn differently, are gifted, or need a customized schedule." [Doc. No. 117-3 at 3]. Fusion Academy plans to enroll seventy-five students and adopts a one student to one teacher model, where each student's educational experience is personalized. [*Id.* at 2, 8, 9].

Phillips Academy, the Pike School, the Andover School of Montessori, and the St. Augustine School are private schools currently operating in Andover. [Doc. No. 117 at ¶ 6]. The Pike School has been in existence since 1926. [Doc. No. 117-60 at ¶ 3]. Phillips Academy has been in existence since 1778. [Doc. No. 117-29 at 18]. The Andover School of Montessori has been operating a private school for grades PK-6 since 1999, and grades 6-8 since 2001. [Doc. No. 117 at ¶ 29]. Unlike Fusion Academy, all four schools are not-for-profit. [Doc. No. 129 at ¶ 448]. Unlike Fusion Academy, all four private schools have an outdoor space such as playing field(s) or a playground for use by their students. [*Id.* at ¶ 451].

Additionally, unlike Fusion Academy, the Pike School and St. Augustine School have not been required by ASC to seek approval to operate as a private school in Andover. [Doc. No. 117 at ¶¶ 19, 23]. The ASC and Town have not conducted any reviews, evaluations, assessments or

4

made any determinations whether the curriculums offered by the Pike School and St. Augustine School are equivalent to that offered by APS generally and, specifically, in terms of the following instructional areas: mathematics, science and technology, history and social sciences, English, foreign languages, the arts, and physical education. [*Id.* at ¶¶ 21, 26].

On March 16, 1999, the ASC approved the Andover School of Montessori's application to operate as a private school for grades PK-6; on June 19, 2001, the ASC approved the addition of a middle school program, grades 6-8. [*Id.* at ¶ 29]. ASC approved Phillips Academy as a private school pursuant to M.G.L. c. 76, § 1, on December 9, 2010. [*Id.* at ¶ 34]. The only evidence the ASC has of its approval of Phillips Academy as a private school pursuant to M.G.L. c. 76, § 1 are the ASC's meeting minutes and a recorded audio-video of the meeting itself. [*Id.* at ¶ 35]. According to the ASC December 9, 2010 meeting minutes, the only mention of the review process respecting Phillips Academy is the following entry: "Dr. McGrath [then Superintendent of Schools] stated she has read and reviewed the curriculum/program of study documents and deems all requirements have been met and is therefore recommending approval." [*Id.* at ¶ 36].

### E. Home Schooling Applications And The ASC Home School Policy

Approximately 141 homeschooling applications were submitted to the Town between 2018 to 2022. [Doc. 105-25 at 2]. Approval of home school applications and private school applications, like Fusion Academy, are reviewed under the standards set forth in M.G.L. c. 76, § 1. [Doc. No. 129 at ¶ 432].

ASC's Home School Policy explicitly includes procedures for approval, including application process, timetable, requested documentation, and means for measuring progress; records and materials required to be maintained; and the criteria for measuring the "thoroughness and efficiency" of instruction in such areas as the program of studies and curriculum, student

5

performance assessment procedures, the length of school year, parental requirements and obligations, textbooks and materials, and maintenance of student records. [Doc. No. 117 at ¶ 89]. According to the Home School Policy, "[i]f the Committee determines that at home instruction situation is inadequate, a conference between the parents or legal guardian and the Superintendent will be scheduled to find mutually acceptable way to correct any deficiency." [Doc. No. 105-29 at 3].

### F. Fusion's First Application

#### 1. The People

At the time of Fusion's first application (the "First Application"), the Superintendent was Dr. Berman and the Assistant Superintendent was Trach. [Doc. No. 129 at ¶ 438–39]. The ASC designated Dr. Berman, who in turn designated Trach, to review the First Application and make a recommendation on approval to the ASC. [*Id.* at ¶ 455]. The ASC members were Tracey Spruce ("Spruce"), Joel Blumstein ("Blumstein"), Susan McCready ("McCready"), Paul Murphy ("Murphy"), and Shannon Scully ("Scully"). [Doc. No. 101-2 at 2]. Scully was Chair of the ASC. [*Id.*]. Sara Stetson ("Stetson") was the Assistant Superintendent for Student Services from 2018 to 2022. [*Id.*].

At the time of the First Application, Michelle Houlihan ("Houlihan") was the Head of School for Fusion – Andover. [Doc. No. 129 at ¶ 454]. Mike Van Dinther ("Van Dinther") was Fusion's Vice-President for New School Development. [Doc. No. 101-2 at 2].

#### 2. The First Application And Email Communications Before The March 2019 Report

On or about July 2018, Fusion submitted its proposal to operate Fusion Academy, a private school in Andover. [Doc. No. 117-4 at 2]. After Fusion's submission, Trach reviewed the ASC Policy, which references M.G.L. c. 76, § 1, and DESE's website and located the DESE

6

Advisory. [Doc. No. 129 at ¶ 456]. In relying on the language of these documents, Trach was not directly comparing the Town's public schools with Fusion but evaluating the thoroughness and efficiency of Fusion's program with that of the Andover School Department. [*Id.* at ¶ 457].

On September 23, 2018, in response to an email from Fusion, Trach stated that she was available for a phone meeting and provided a list of at least twenty-seven questions for Fusion to answer regarding their proposed school.[2] [Doc. No. 117-5 at 2–3]. At some point, Trach advised Van Dinther, "[the application review is] not an iterative process" and she would render her own opinion of Fusion's programs. [Doc. No. 129 at ¶ 458]. Additionally, early in the review process, Trach communicated to Van Dinther that as a precondition to approval, Fusion must secure a certificate of occupancy for physical facilities within which to operate its proposed school. [Doc. No. 117 at ¶ 91]. As a result of the requirement of a certificate of occupancy, Fusion started a complete build-out, at a cost of about $1,400,000, of space that it had previously identified. [*Id.*].

Then on October 3, 2018, Trach sent Dr. Berman an email describing questions she had about the First Application and Fusion's responses thereto. [Doc. No. 129 at ¶ 464A]. On October 4, 2018, ASC's then counsel sent Dr. Berman, Trach, and Assistant Superintendent Stetson, an email asking to touch base about Fusion's application and informed them that she had

---

[2] Trach's questions included the following:
1. How is the curriculum delivered? Is it delivered via a web platform?
2. If it is mainly a web-platform based course of study, how does the leased location in Andover part of the academy? Is it a space to teach small groups or classes? Or is it an office?
3. Can you send me a sample school calendar for Fusion Academy? Are there school vacations and/or other no school days?
4. What is the total hours of learning in a middle school student's and high school student's week, as well as in the 170 day school year? (For Gr 6-8? 9-12?)
5. What is Mastery Day? How does this equate to time and learning towards the standards and credits in the Fusion schedule? How is Mastery Day structured?
....
27.
[Doc. No. 117-5 at 3–4]

been through the process with other startups in the district. [Doc. No. 101-20 at 2]. That same day, Stetson replied and stated her concern, that she had "this happen once before" across the street from the middle school in the district where she was working at the time, and that "[t]his particular group was going to 'cure' ADHD by giving the kids a cup of water every hour— because this would fix their brains. No joke!." [*Id.*]. To which ASC's then counsel responded: "Well, hydration is important. And encourages frequent movement breaks." [Doc. No. 101-21 at 2].

On November 28, 2018, as part of her review of the First Application, Trach visited Fusion's Newton campus. [Doc. No. 129 at ¶ 465; Doc. No. 117 at ¶ 327]. On March 3, 2019, ASC's then counsel sent Trach via email an article about the gig economy told through the experience of a teacher at Fusion Academy in California and stated "[i]nteresting insight; might give you some additional ammo. I'll let you know what [I] found out from my inquiries." [Doc. No. 102-5 at 2]. On March 4, 2019, in an email to Dr. Berman, Trach stated, "I have consulted with [ASC's then counsel] and would like to discuss more with you this afternoon. She also provided the following articles for our awareness: Project to Turn Teachers into On-Demand Contractors for the children of the Wealthiest 1 Percent- The Gig Economy at its worst Article and This DeVos-Style School Turned Teachers Into Gig Economy Workers Article."[3] [Doc. No. 117 at ¶ 123; Doc. No. 102-6 at 2].

---

[3] The two articles are: Spencer, Keith, *The gig economy goes to class*, Salon, June 3, 2017, https://www.salon.com/2017/06/03/the-gig-economy-goes-to-class/ and Weissman, Cale Guthrie, *This DeVos-Style School Turned Teachers Into Gig Economy Workers*, Fast Company, April 26, 2018, https://www.fastcompany.com/40553329/at-this-revolutionary-school-some-teachers-have-to-go-on-unemployment.

### 3. __The March 2019 Report And March 2019 Meetings__

On March 5, 2019, Trach provided her review of the First Application to Dr. Berman (the "March 2019 Report"). [Doc. No. 102-7 at 2–10]. An ASC meeting was held on March 7, 2019. [Doc. No. 102-11]. A day or two before the March 7, 2019, ASC meeting, Van Dinther became aware that Fusion was on the agenda for discussion but not for a vote. [Doc. No. 98-1 at ¶ 19]. He asked Trach if Fusion should have someone present for the ASC meeting. [*Id.*]. Trach told Van Dinther that Fusion's presence would not help the process. [*Id.*]. At the meeting, Trach presented the ASC with the March 2019 Report. [Doc. No. 117 at ¶ 126]. Scully, as ASC chair, did not post the March 2019 Report with the ASC agenda nor was Fusion provided with a copy. [*Id.*]. No recommendation was made by Trach at this meeting and no vote was taken on the application. [*Id.*].

Another ASC meeting was held on March 21, 2019. [Doc. No. 102-12]. On the morning of March 21, 2019, Fusion was sent a copy of the March 2019 Report. [Doc. No. 117 at ¶ 128]. That same day, at a March 21 ASC meeting, Fusion representatives spoke without interruption on behalf of Fusion and answered questions. [Doc. No. 129 at ¶ 467]. No action was taken on Fusion's First Application. [Doc. No. 117 at ¶ 129].

> After the meeting, on March 25, 2019, Van Dinther in an email to Trach, stated,
>
> I am reaching out to connect regarding next steps and follow up at the meeting last week. When we left the meeting, the committee indicated that they would like more information and that they would funnel requests through you. I noted they would like more information about our teachers and post Fusion outcomes. We are gathering that information. Will you please send me a list of any other questions from the committee along with any other outstanding requirements or open issues from your standpoint. It would also be great if we could connect on the phone. I would love to hear your input, feedback on the meeting, and next steps.

[*Id.* at ¶ 131].

9

On March 29, 2019, Trach, in an email to Mike Van Dinther, responded to the immediately preceding email and stated, "You have a copy of my memorandum to Dr. Berman which was shared with SC as well as the questions from SC when you presented to them. I have no further questions to share." [*Id.* at ¶ 132]. On March 29, 2019, ASC member Spruce in an email to Dr. Berman sent the two gig economy articles that she had sent ASC Scully the day before, and Dr. Berman then forwarded them to ASC members McCready and Blumstein. [*Id.* at ¶ 134]. Noone from the district or ASC asked Fusion about the two media articles. [*Id.* at ¶ 135].

### 4.  **Edits To The March 2019 Report**

On April 1, 2019, Dr. Berman emailed a memo of various school committee updates to all five members of the ASC. [Doc. No. 102-17]. Dr. Berman's memo included a Fusion Academy heading, which stated that Trach would be recommending against approval of the First Application, that Trach's report covers the most significant concerns, and that Dr. Berman supports Trach's recommendation against approval. [Doc. No. 102-17 at 4]. Fusion was not provided a copy of Dr. Berman's memo or notified of his recommendation at that time. [Doc. No. 117 at ¶ 137].

On April 2, 2019, Blumstein emailed Spruce suggesting changes to how Trach's recommendation should be structured. [Doc. 102-21 at 2]. On April 3, 2019, Blumstein and Spruce, in emails to Trach, which copied ACS's then counsel, provided suggested revisions to Trach's March Report.[4] [Doc. No. 117 at ¶ 148; Doc. No. 102-24 at 2].

---

[4] In one email, Blumstein stated,

> …I know this is a lot but we really think it is worth the time to make your memo as strong as possible so as to best support your recommendation. It will help persuade any doubting members of the SC of the soundness of your recommendation and will show the community the thoroughness of your analysis. It also will put us in the best possible position if our decision is subject to judicial review.

[Doc. No. 117 at ¶ 148; Doc. No. 102-24 at 2].

On April 3, 2019, the day of a scheduled ASC meeting, at approximately 7 PM, Fusion was notified that the ASC vote on its application would be rescheduled to a future meeting. [Doc. No. 117 at ¶ 151]. Around five days later, on the evening of April 8, 2019, Trach emailed Fusion that its private school application was on the agenda for vote for the April 11, 2019, meeting. [Doc. 103-4 at 2; Doc. No. 129 at ¶ 472].

On April 10, 2019, at approximately 10:57 AM, Berman in an email to then ASC counsel, stated, "I met with Tracy [Spruce] and Shannon [Scully] this morning. Attached are some suggested final changes. Once you make these changes, can you send it to Sandy? Thanks." [Doc. No. 117 at ¶ 155]. The April 2019 Report is dated April 10, 2019, and addressed to the ASC. [Doc. No. 103-6 at 2]. On April 10, 2019, at approximately 5:32 PM, Trach shared the April 2019 Report in an email to Van Dinther and Houlihan. [Doc. No. 117 at ¶ 156].

On April 11, 2019, at approximately 10 AM, Fusion emailed Scully requesting that Fusion Academy be removed from the evening's agenda because it had received the April 2019 Report less than 24 hours earlier. [*Id.* at ¶ 157]. It also noted the absence of a response, made just after the March 21, 2019 ASC meeting, for a list of any open issues or outstanding items. [*Id.*]. On April 11, 2019, at approximately 2:02 PM, Alison Phelan, Dr. Berman's assistant, in an email to ASC's then counsel, stated, "Shannon [Scully] and Shelley [Berman] wanted me to check with you on how to word the SC motion for tonight. I have a simple one, but they thought I should ask you to be sure of what to say: MOTION: I move that the ASC vote to decline the Fusion Academy application for private school approval. Per the recommendation of the supt. and asst. supt. of schools." [Doc. No. 117 at ¶ 158]. On April 11, 2019, at approximately 4 PM, Scully emailed Fusion, declining to remove Fusion from the agenda, stating: "The Committee has not yet had a chance to discuss Ms. Trach's memo or recommendation issued yesterday, and tonight's meeting presents us the first opportunity." [*Id.* at ¶ 160].

11

###### 5.  **The April 11, 2019 Meeting**

At the April 11, 2019, ASC meeting, five members of Fusion spoke on Fusion's behalf for approximately twenty minutes. [Doc. No. 129 at ¶ 476]. The first Fusion speaker, Van Dinther, stated "Thus far, we failed to articulate the power and success of our program." [*Id.*]. Van Dinther went on to state that Fusion was not seeking Andover School Department's Special Education dollars and "97-98% of our students is parents private pay." [*Id.*]. At the April 11, 2019, ASC meeting on Fusion's First Application, no member of the ASC made a comment or expressed a concern about the Andover School Department possibly losing some IDEA funds for students with a disability, if Fusion was approved to operate a private school. [*Id.* at ¶ 477]. On April 11, 2019, the ASC voted (5-0) not to approve Fusion's First Application. [*Id.* at ¶ 478].

According to ASC member Murphy, in reviewing the First Application, Trach was especially critical because she felt that Fusion could not provide programs for students with social-emotional or mental health disabilities. [Doc. No. 117 at ¶ 113; Doc. No. 105-7 at pp 117:14–179:2]. Trach did not mention in her reports or in the presentation to the school committee that no such program was offered by Andover Public Schools at the high school. [*Id.*]." Furthermore, Mr. Murphy was left with the impression that the issue of a special education budget or special education dollars was a concern for Dr. Berman and other members when discussing Fusion. [Doc. No. 117 at ¶ 116; Doc. No. 105-7 at pp 79:7–80:6]. If a student has an IEP from Andover Public Schools—and attends a private school, whether in Andover or elsewhere, it remains the Andover Public School's responsibility to provide these services. [Doc. No. 117 at ¶¶ 118–120]. Additionally, "out-of-district placements respecting special education students" was a frequent "topic of discussion amongst the school committee." [*Id.* at ¶ 112]. "There was concern that . . . the district was not meeting the special needs . . . for some of our

students and that many families were opting to take their children to other schools and thereby requiring… the Town then to cover those expenses." [*Id.*].

### 6. The April 2019 Report

The April 2019 Report begins with background as to when Fusion Academy submitted its application. [Doc. No. 103-6 at 2]. Trach begins the report by referencing M.G.L. c. 76, § 1 and the DESE Advisory sample criteria, and states: "As compared to the robust curriculum and hours of direct instruction offered in APS, Fusion fails to satisfy the statutory standard set forth in M.G.L. c. 76, §1." [*Id.*]. Specifically, the April 2019 Report identifies how the Fusion curriculum is not equivalent to APS generally and specifically in certain subject areas[5] and does not provide adequate hours of direct instruction per school day/school week and in each subject. [*Id.* at 2–3]. According to the April 2019 Report, "For a year-long course, a Fusion student would receive approximately forty-two (42) direct hours of instruction. In contrast, an AHS year-long course requires one-hundred nineteen (119) hours of direct instruction, which does not include time spent on homework." [*Id.* at 3]. Trach also identifies how Fusion requires fewer core courses for graduation as compared to AHS and differentiates AHS's and Fusion's course and the credit requirements. [*Id.* at 4].

Additionally, according to the April 2019 Report, several application materials were not provided, despite multiple requests, including an anti-discrimination policy, staff, student and parent handbooks that communicates school policies including students' health care needs, student records regulations, attendance, and student discipline, and data regarding teacher turnover rates, subject matter expertise, or its policy regarding teacher preparation time. [*Id.*].

---

[5] The April 2019 report identifies these subjects as Mathematics, Science and Technology, History and Social Science, English, Foreign Languages, the Arts, and Physical Education. [*Id.* at 3].

In the section labeled "Additional Concerns," Trach states that Fusion will admit students who have not been successful in traditional school environments, including students with learning differences, anxiety, and depression. [*Id.*]. Trach states in her report that "There is no indication, however, that Fusion intends or has the capacity to provide students with direct services to address their social, emotional, and behavioral needs (e.g. psychological services, counseling, social work, nursing, etc.)." [*Id.* at 5]. She then compares APS's services, which provide "extensive direct support and instruction." [*Id.*]. In her report, Trach states that Fusion will not have a nurse on site, and describes that this will affect students requiring medical management of diabetes and chronic conditions, students with allergies, and students who require administration of prescription medication during the school day. [*Id.*]. According to the 2019 Report, Fusion will have to decline to admit or terminate the enrollment of students based on medical conditions and will be unable to address emergency medical needs on site. [*Id.*]. Finally, Trach compares how APS has more robust teacher licensing requirements as compared to Fusion. [*Id.*]. She then summarizes her findings and provides a final recommendation "that the Andover School Committee decline to approve Fusion's application for private school approval." [*Id.* at 5].

### 7.  **Aftermath Of The April 10, 2019 Meeting**

After the vote, Fusion hired an outside consultant to help with revisions to its application to align the new one with the DESE Advisory and to address criticisms. [Doc. No. 117 at ¶ 383]. Meanwhile, Fusion started to offer tutoring classes at the Andover space that it had leased and built out as a prerequisite for consideration of its first application ("Fusion Andover"). [*Id.* at ¶ 384]. While working with the consultant, Fusion sent an application to the town of Hingham on February 14, 2020. [*Id.* at ¶ 385]. The Hingham application was the same as the first Andover

application, but it was reformatted to align better with the DESE Advisory. [*Id.*]. Hingham's school committee approved Fusion's application on June 15, 2020. [*Id.*].

On January 16, 2020, ASC's then counsel, sent Dr. Berman and other Andover school officials a copy of a decision from the Fifth Circuit titled, "Reimbursement for Unilateral Placement." [Doc. No. 117-17 at 2]. According to ASC's then counsel, parents were awarded over $100,000 in reimbursement for unilateral placement of their child at Fusion Academy. [*Id.*]. Dr. Berman then asked if he could pass the decision on to the ASC. [*Id.*]. Counsel responded, "Sure. BUT—this is not and cannot be the reason the SC opposes approval of their 'academy.'" [*Id.*]. On May 7, 2020, Houlihan met with Dr. Berman. [Doc. No. 129 at ¶ 485]. Houlihan maintains that she "recorded" the substance of what they discussed in a May 7, 2020 email to Van Dinther. [*Id.*]. One of Houlihan's bullet points reads, "Very positive and does not dislike Fusion or private schools." [*Id.*].

### 8.  Dr. Berman's Communications To The Newton And Burlington Superintendents

Meanwhile, on April 25, 2018, Dr. Berman in an email to Wellesley Superintendent David Lussier stated: "I very much appreciate all the research you have done on Fusion Academy. Hopefully, they will just go away." [Doc. No. 117 at ¶ 101]. On September 10, 2018, Dr. Berman, in an email to Burlington Superintendent Eric Conti stated: "It may be a bit archaic, but I have some concerns about them. I think the requirements are clear but we need a review process and the school committee does not have that in place." [*Id.* at ¶ 102]. On September 29, 2018, Dr. Berman in an email to Trach, stated: "Please make clear that they [Fusion] can't advertise or accept students until they are approved by the School Committee, which could take a while since there is no policy or process in place for doing that at this time." [*Id.* at ¶ 104].

15

On March 8, 2019, Dr. Berman sent to the superintendents of Newton and Burlington a copy of Trach's March 2019 Report and informed them they would likely be recommending against approval. [*Id.* at ¶ 69]. On April 3, 2019, at approximately 8:25 AM, Berman, in an email to David Fleischman, Newton Superintendent, and Eric Conti, Burlington Superintendent, stated, "We will be recommending rejecting Fusion's application. Attached is the recommendation as well as two articles on Fusion. The vote is likely to take place tomorrow night." [*Id.* at ¶ 145]. None of this information was ever communicated to Fusion. [*Id.* at ¶ 146]. Subsequently, Berman conveyed to the Newton and Burlington superintendents that they were revising the memo, would make the recommendation at the next meeting, and requested to not share the memo at the time. [*Id.* at ¶ 150].

### G. Fusion's Second Application

#### 1. The People

Initially, the ASC designated Trach and Dr. Berman to review Fusion's Second Application and make a recommendation on approval to the ASC. [Doc. No. 129 at ¶ 489]. However, Dr. Berman resigned effective December 31, 2020, and was succeeded by Dr. Bach as the interim superintendent from January 1, 2021, to June 30, 2021. [*Id.* at ¶¶ 495–96]. Toward the end of his superintendency, Dr. Berman prepared a "Transition Tasks" memorandum for his successor, Dr. Claudia Bach, which included a section titled "Fusion Academy." [*Id.* at ¶ 493]. The Dr. Berman memorandum states, in part, that Fusion's Second Application to open a private school is being reviewed by Trach and that she ". . . will issue a report on whether Fusion provides a comparable program to that of the Andover Public Schools. [*Id.*]. The superintendent will have to make a recommendation to the ASC, based on this report, to either approve or deny approval as a private school." [*Id.* at ¶ 493].

At the time of the vote the ASC members were Tracey Spruce ("Spruce"), Lauren Conoscenti ("Conoscenti"), Susan McCready ("McCready"), Paul Murphy ("Murphy"), and Shannon Scully ("Scully"). [Doc. No. 101-2 at 2; Doc. No. 104-19]. Scully was Chair of the ASC. [Doc. No. 101-2 at 2]. Sara Stetson ("Stetson") was the Assistant Superintendent for Student Services from 2018 to 2022. [*Id.*]. Van Dinther and Houlihan remained representatives of Fusion. [Doc. No. 101-2 at 2; Doc. No. 129 at ¶ 454].

## 2. **The Second Application**

On or about May 14, 2020, Fusion resubmitted its application (the "Second Application"). [Doc. No. 117 at ¶ 212]. The Second Application, together with introductory material and appendices, was over 500 pages long. [*Id.* at ¶ 213]. As with the First Application, Fusion Academy had no timetable by which to measure the progress of the review process. [*Id.* at ¶ 214]. From on or about October 5, 2020, to March 2021, Van Dinther contacted Trach several times to inquire as to the status and progress of her review, what she needed from him, and inquiries of that nature. [*Id.* at ¶ 221].

On January 3, 2021, Bach in an email to Trach stated,

It seems to me we are losing the argument [Fusion's] program does not meet our standards… it's been hard to prove it's inferior, because every statement we make, they come back with a counter argument. They are slick that way. But what I think we can speak to is their delivery is unsatisfactory. It is (though we'd perhaps not want to put it this way) APS on our worst hybrid days when we first had to put the model in place…

[Doc. No. 104-8; Doc. No. 117 at ¶ 226].

At some point in the spring of 2021, all five members of the ASC took a tour of Fusion Andover. [Doc. No. 129 at ¶ 487; Doc. 117-32 at 5]. At some point, Trach had a conversation with Van Dinther about the application process; Trach informed Van Dinther that the ASC

would follow the DESE standards and would need everything in the DESE standards checked off before the school committee would do their review. [Doc. No. 117-32 at 12].

### 3. The March 18, 2021 Meeting

On March 16, 2021, the ASC publicly posted the agenda which listed Fusion as "information only" for its March 18, 2021, virtual meeting; Fusion was not specifically invited. [Doc. No. 117 at ¶¶ 231, 233]. Fusion was allowed to make use of public comment, which occurred at the beginning of the meeting and prior to the hearing on any specific agenda item. [*Id.* at ¶¶ 233–34]. The March 18, 2021, ASC Meeting transcript does not contain any statements made by Fusion personnel. [*Id.* at ¶ 237]. At the meeting, Trach stated that student learning time raised questions as to whether Fusion Academy rises to the equivalency of the public schools. [*Id.* at ¶ 238].

After the meeting, on March 23, 2021, Trach provided a memorandum to Dr. Bach, which contained her review and analysis of the Second Application. [Doc. No. 129 at ¶ 503]. On March 23, 2021, at approximately 3 PM, ASC posted its agenda for its March 25, 2021, meeting. [Doc. No. 117 at ¶ 245]. Fusion's application was listed as a vote item for hearing. [*Id.*]. Scully did not authorize the posting of any written report with the agenda on March 23, 2021. [*Id.*]. On March 24, 2021, at about mid-day, the public agenda had been changed on the ASC's website to include a memorandum from Trach to Dr. Bach, dated March 23, 2021 (the "March 2021 Report"). [*Id.* at ¶ 246]. The March 2021 Report, 15 pages long, recommended that the ASC deny Fusion's application. [*Id.*]. Fusion, having about 30 hours to react to the March 2021 Report, submitted a responsive letter to the ASC approximately one hour before the scheduled meeting on March 25, 2021. [*Id.* at ¶ 247]. Fusion requested Scully to post its response to the ASC website and to read it during the hearing on its application. [*Id.* at ¶ 248]. Like the March

18 meeting, and as a result of Scully having expressly directed they not be invited into the March 25, 2021 virtual meeting, Fusion was restricted to addressing the March 2021 Report during the public comment session prior to the start of the hearing on its application. [*Id.* at ¶ 249].

### 4. The March 25, 2021 Meeting

At the start of the ASC meeting on March 25, 2021, Van Dinther and Houlihan spoke on Fusion's behalf. [Doc. No. 129 at ¶ 507]. After considerable colloquy among the School Committee members, the ASC denied the Second Application. [*Id.*]. McCready, Spruce, Conoscenti, and Scully voted against approval; Murphy voted for approval. [Doc. No. 104-19 at 15]. Each ASC member who voted not to approve Fusion's applications did so principally based on Trach's recommendations. [Doc. No. 117 at ¶ 305]. The four ASC members who voted to deny the Second Application stated that a major consideration was Fusion's non-compliance with the student learning time regulations, as articulated by Trach. [Doc. No. 129 at ¶ 508]. For her criteria, Trach used the DESE Advisory on private schools, the Andover SC policy LBC on private schools and M.G.L. c. 76, § 1. [*Id.* at ¶ 314]. She also looked at the DESE website and consulted with counsel. [*Id.* at ¶ 315]. In addition, she enlisted the help of principals and program coordinators and curriculum coordinators. [*Id.* at ¶ 316]. To determine the thoroughness of Fusion's instruction, Trach looked at the eleven criteria mentioned in the DESE Advisory and at what Fusion had provided and developed a summary of her findings. [*Id.* at ¶ 318].

### 5. The March 2021 Trach Report

In the fifteen-page March 2021 Trach Report, Trach evaluates eleven criteria for consideration.[6] [Doc. No. 104-18]. In her summary, Trach states that Fusion's application falls

---

[6] These eleven criteria are admission criteria, physical plant/safety, curriculum, education materials, school staff, administration, records, student services, financial support, student learning time, and student performance assessment. [*Id.*].

short on in-person instruction and student learning time. [*Id.* at 15]. "Fusion's approximately 9 hours/week of in-person instruction (according to their sample schedule), 23 hours per course/per semester, and 46 hours of in-person instruction/school year for a grades 6-8 and 9-12 proposed school is far under the MA DESE standard and in turn, for Andover Public Schools." [*Id.*].

### 6.  Dr. Berman's Comments And The ASC Fiscal Budget

On or about February 10, 2021, Berman told Houlihan of Fusion that the reason Fusion's first application was denied and that the second application would likely be denied as well was the "district funding" issue, "100%." [Doc. No. 117 at ¶ 227]. "[T]he district is afraid of the competition and funding that would come to Fusion for families suing the district." [*Id.*].

On or about September 12, 2020, the ASC released its fiscal 2021 Andover Public Schools Approved Budget document, which was signed by Scully ("FY21 Budget"), which identified special education as a major budget driver. [*Id.* at ¶ 214–215].

## II.    LEGAL STANDARD

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Generally, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).

Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (internal citations and quotations omitted). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson*, 477 U.S. at 252).

## III.  DISCUSSION

Fusion moves for summary judgment on three grounds: violation of Fusion's equal protection of the law, violation of Fusion's due process rights, and violation of Fusion's First Amendment Right to Academic Freedom. Defendants oppose Fusion's Motion for Summary Judgment and assert they are entitled to summary judgment on their Cross-Motion. Defendants argue that Fusion has not presented any facts upon which a reasonable jury could find that its private school applications were denied based on any constitutional deprivation or discriminatory animus. Defendants also move for summary judgment on Fusion's claim under the Americans with Disabilities Act.

### A.    Equal Protection Claim

#### 1.  Fusion's Motion

Fusion does not allege that it is has been discriminated against based on its membership of a specific class or group. As such, Fusion is a class of one plaintiff. *See Snyder v. Gaudet*, 756 F.3d 30, 34 (1st Cir. 2014) (citing *Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 774–75 (1st Cir. 2010)). ("Where a plaintiff alleges he has been singled out for reasons "unique to him, rather than because of his membership in a group, his [E]qual [P]rotection claim is of the 'class of one' variety."). To prevail on its equal protection claim, Fusion must show that the identified

21

comparators are "similarly situated in all aspects relevant to the challenged governmental action." *McCoy v. Town of Pittsfield, NH*, 59 F.4th 497, 507 (1st Cir. 2023) (quoting *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 640 (1st Cir. 2013)). An individual is "similarly situated" to others for Equal Protection purposes when there is "an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (citation omitted). Class-of-one plaintiffs must "identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995) (citation omitted) (alteration in original).

Citing to *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 682 (7th Cir. 2017) and *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1013 (7th Cir. 2019), Fusion first argues it need not identify a similarly situated comparator because the classification – private schools – appears in the text of the M.G.L. c. 76, §1. However, unlike the cited Seventh Circuit cases, Fusion is not challenging *a statute* that directly imposes regulatory burdens on a specific class or group; rather, Fusion challenges Defendants' application of the statute. *Id.* Thus, Fusion must identify a similarly situated comparator.

Alternatively, Fusion argues private schools and approved homeschooling applicants in Andover are similarly situated to Fusion because both are subject to the same standard under M.G.L. c. 76, § 1. This situation is analogous to the land-use context, where the similarly situated requirement must be enforced with particular rigor because town school committee decisions "will often, perhaps almost always, treat one [applicant] differently from another." *See id.* at 251. "Thus, [Fusion]—in order to show that other parties were similarly situated to them—

needed to adduce evidence sufficient to establish factual as well as regulatory similarity." *See id.* at 252.

Regarding factual similarity, Fusion has not provided any information about the Pike and St. Augustine's schools other than that Pike was created in 1926, and that the ASC has never required the schools to seek approval to operate as private schools or evaluated them on various factors like instructional hours, student learning time, educational materials utilized, disciplinary policies etc. Without more information about the Pike and St. Augustine schools, themselves, this Court cannot determine whether there is "an extremely high degree of similarity between [Fusion] and [Pike and the St. Augustine schools]." *See Conlon*, 494 F.3d at 251.

Fusion does provide information that ASC approved Phillips as a private school in 2010, and Montessori in 1999 for grades PK-6 and in 2001 for grades 6-8. According to Fusion, on each occasion, the review process bore no relationship to that applied to Fusion. Again, Fusion has not fulfilled its burden to show the preliminary step that it is similarly situated to Phillips and Montessori. Although Fusion was a proposed secondary school for grades 6-12 like Montessori, that fact alone is not enough to meet the "extremely high degree of similarity" standard. *See id*.

Fusion also argues there is no evidence that even one home school application has been denied, and that the Home School Policy has explicit procedures for the approval process, which is iterative. According to Fusion, the process for home schooling is in marked contrast to what the ASC and Superintendent Dr. Berman insisted upon for Fusion. To the extent that Fusion argues that Defendants never denied a home school application, that fact is in dispute. [Doc. No. 105-25 at 2; Doc. No. 117 at ¶ 88]. Furthermore, that the Home School Policy has explicit procedures for approval or whether the process is iterative is irrelevant to determining the

preliminary step of whether home schooling applicants are similarly situated comparators to Fusion.

Because it has not identified valid similarly situated comparators, Fusion's Motion for Summary Judgment pertaining to its equal protection claim is <u>DENIED</u>.

### 2. **Defendants' Cross-Motion**

Defendants first argue that the Court need not address Fusion's equal protection and due process claims at all because the Supreme Court has held in *Enquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008), that class of one equal protection claims are not applicable to discretionary governmental decisions, such as the ASC's decision here. Defendants take too broad of a reading of *Enquist*. *See id.* The First Circuit has clearly stated, "[i]n *Engquist*, the Supreme Court identified one sphere -- public employment -- in which plaintiffs cannot bring class-of-one equal protection claims at all." *Back Beach Neighbors Comm. v. Town of Rockport*, 63 F.4th 126, 132 (1st Cir. 2023) (cleaned up). This case does not involve a *public employment* class-of-one equal protection claim, and as such the Court must address Fusion's equal protection and due process claims.

Defendants also argue that Fusion is not a similarly situated comparator to the Andover private schools and homeschool applicants. In support, Defendant points out that Fusion is owned by a private equity fund and operates as a for profit entity whereas Andover's private schools are not for profit corporations and  Fusion has not established that any of the four schools promote or use a one-to-one approach as their teaching model. Although Defendants now also assert that all four schools operate out of their own building rather than a shared commercial space like Fusion, this fact has not been established in the record for purposes of summary judgment. Furthermore, as Defendants themselves highlight, I am without sufficient

facts as to whether any of the four private schools operating in Andover utilize a one-to-one approach like Fusion. Finally, the fact that Fusion lacks outdoor space and is a for profit entity owned by a private equity fund, in contrast to Andover's private schools, is not enough to determine that Fusion is not similarly situated to the four private schools. Whether Fusion is similarly situated to other private schools or home-school applicants involves fact-intensive inquiries not suitable for resolution at summary judgment.

Moreover, Fusion has presented sufficient evidence to raise a genuine dispute of material fact as to whether it was treated differently from other private schools or home-school applicants. Fusion submitted evidence that they were not subjected to the same level of scrutiny, and that Fusion's application was denied based on standards not uniformly applied. Fusion also points to internal communications suggesting hostility toward its model of education, and to inconsistencies in the rationale offered by the ASC. While these factual disputes do not entitle Fusion to summary judgment, they are sufficient to survive Defendants' motion. Thus, Defendants Cross-Motion pertaining to its Equal Protection claim is <u>DENIED</u>.

### B.  <u>Procedural Due Process</u>

"To establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011). "Here, Fusion Academy has a liberty interest in its academic freedom and arguably a property interest in the amount expended on the lease of the school site." *Fusion Learning, Inc. v. Andover Sch. Comm.*, 609 F. Supp. 3d 5, 14 (D. Mass. 2022). Thus, the question becomes: whether Fusion was given proper notice and a meaningful opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

25

Defendants argue that Fusion received adequate procedural due process, pointing to the multiple communications and meetings between Fusion and school officials. Fusion, however, contends that it was denied a fair hearing before a neutral decision-maker and was subject to an arbitrary process lacking adequate standards. I find that genuine disputes of material fact preclude summary judgment. Fusion has introduced evidence—including newly discovered internal ASC emails and an opinion from the Massachusetts Attorney General's Office concluding that the ASC violated the Open Meeting Law—that call into question the neutrality and transparency of the decision-making process. Moreover, Fusion argues that the criteria used to evaluate its application were not clearly established or uniformly applied, further supporting its procedural due process claim.

### 1.  **<u>Post-Deprivation Remedies</u>**

At the outset, Defendants contend that even if Fusion's pre-deprivation process were deficient, it had access to adequate post-deprivation remedies under Massachusetts law. Specifically, Fusion's claims of declaratory relief are available under state law and Fusion could have brought a claim against the School Department officials for intentional interference with prospective contractual relations seeking the same money damages it seeks in this case. Here, Fusion alleges that the denial was part of a broader pattern of biased conduct and misuse of official discretion by the ASC, not a random or unauthorized act. As such, Fusion argues the adequacy of post-deprivation remedies does not foreclose its procedural due process claim.

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (cleaned up). "In some circumstances, [] the Court has held that

26

a statutory provision for a post deprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id.* at 128. The *Parratt-Hudson* doctrine provides such circumstance. *Hudson v. Palmer,* 468 U.S. 517, 533 (1984); *Parratt v. Taylor,* 451 U.S. 527 (1981) (together, "*Paratt-Hudson*"). The purpose of the "[t]he *Parratt–Hudson* doctrine [is] to protect states from needlessly defending the adequacy of state law process when the alleged due process violation results from a deviation from that process." *Chmielinski v. Massachusetts*, 513 F.3d 309, 315 (1st Cir. 2008) (cleaned up). According to the *Parratt-Hudson* doctrine, "'[w]hen a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, ... the due process inquiry is limited to the issue of the adequacy of the postdeprivation remedies provided by the state.'" *3137, LLC v. Town of Harwich*, 126 F.4th 1, 12 (1st Cir. 2025) (cleaned up). "Before invoking the *Parratt–Hudson* doctrine, however, courts must give a hard look at allegations that conduct is 'random and unauthorized.'" *Chmielinski*, 513 F.3d at 315; *see also Zinermon*, 494 U.S. at 138.

Where "the State has delegated to [Defendants] the power and authority to effect the very deprivation complained of" and "also delegated to [Defendants] the concomitant duty to initiate procedural safeguards set up by state law to guard against [the deprivation]" such conduct cannot be characterized as "unauthorized." *Zinermon*, 494 U.S. at 138. Here, Defendants actions were not unauthorized because M.G.L. c. 76 § 1 is silent as to procedural safeguards that protect against deprivation. M.G.L. c. 76 § 1 simply states that school committees have the power to approve a private school "when satisfied that the instruction in all the studies required by law equals in thoroughness and efficiency…" Thus, the meetings pertaining to Fusion's applications "cannot be characterized as a deviation from the state law" because they were not random and

27

unauthorized. *Chmielinski*, 513 F.3d at 315. As such, my inquiry proceeds to the parties' next procedural due process issue: whether the ASC policy is constitutionally vague.

### 2.   **Vagueness**

Fusion argues that the ASC Policy was unconstitutionally vague and that Defendants acknowledged they should have but did not have policies and procedures for private school applicants. During Fusion's First Application process, Dr. Berman wrote that the policy was very weak and does not comply with DESE guidance, and that the ASC has no policy or procedure for reviewing Fusion's request. As a result, Fusion argues there was no notice from which Fusion could discern what was required of it, which left the Defendants with unfettered discretion.

"The vagueness doctrine, a derivative of due process, protects against the ills of laws whose 'prohibitions are not clearly defined.'" *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (cleaned up). "A statute is impermissibly vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (cleaned up). This creates two avenues by which to attack a vague statute: discriminatory enforcement and lack of notice. *Id.*

The Massachusetts Supreme Judicial Court ("SJC") has held that M.G.L. c. 76 § 1 is not void for vagueness because "the [Massachusetts] Legislature has provided a comprehensive statutory scheme setting the standards for the education of the State's youth. This statutory scheme includes standards under G.L. c. 71, §§ 1, 2, and 3, concerning the subjects that must be taught in public schools and the requirements for teacher qualification" in addition to the requirements of M.G.L. c. 76, § 1. *Care & Prot. of Charles*, 399 Mass. 324, 331 (1987). Here, the language of the ASC Policy mirrors the substantive language of M.G.L. c. 76 § 1 and

28

specifically refers to M.G.L. c. 76 § 1[7]; however, significantly, the ASC Policy does not refer to the larger statutory scheme of G.L. c. 71, §§ 1, 2, and 3. The SJC has specifically held, and I agree, that it is "the body of substantive law referred to above [G.L. c. 71, §§ 1, 2, and 3 that] provides the superintendents and school committees of the Commonwealth with sufficient standards such that G.L. c. 76, § 1, can withstand a challenge of vagueness..." *Id.* Without that reference, Fusion was left to guess at the requirements for approval. On its face alone, the ASC Policy does not meet that standard.[8] Fusion further alleges that Andover officials applied subjective and shifting interpretations of these standards. Courts have recognized that due process requires fair notice of regulatory expectations. Given that Fusion claims the ASC failed to apply consistent benchmarks or disclose a coherent evaluative framework, the vagueness argument raises a triable issue of fact, and at this stage, I cannot determine whether Defendants' policies were "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *Frese*, 53 F.4th at 6.[9]

### 3. Notice And Meaningful Opportunity To Be Heard

#### a. Fusion's First Application

Fusion moves for summary judgment on its procedural due process claim arguing that it was not provided sufficient notice before denial of its First Application. Specifically, Fusion

---

[7] The ASC Policy also references M.G.L. c. 40, § 4E; M.G.L. c. 71, § 71D; M.G.L. c. 71B, § 4 –7A; M.G.L. c. 76, § 1. [Doc. No. 125-28].

[8] Defendants argue that the ASC Policy was coupled with the DESE advisory which provided eleven specific criteria that Trach followed in her review of Fusion's applications. However, while it is true that the DESE advisory provides sample criteria for approval of a private school by a school committee, and there was discussion that Defendants would follow the DESE standards, significantly, the parties dispute whether the DESE criteria were actually followed.

[9] The parties also dispute whether Defendants' enforcement of the ASC policy was discriminatory. Both parties agree that Fusion's discriminatory enforcement challenge mirrors its equal protection claim. The Court denies Fusion's Motion and Defendant's Motion pertaining to discriminatory enforcement for the same reasons stated in Section III.A.1 and A.2.

argues it was given a copy of Trach's March 2019 Report on the morning of March 21, 2019, less than 12 hours before it was to make its presentation to the Andover School Committee and that it was given a copy of the April 2019 Report less than 24 hours before the April 2019 Meeting. Defendants cross move for summary judgment arguing Fusion was provided with all notice it was due and thatFusion was given an extraordinary amount of time by Trach and others before the ASC began its deliberations.

"Due process requires notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections,' and that affords 'the affected individual . . . a fundamentally fair chance to present his or her side of the story.'" *Mard v. Town of Amherst*, 350 F.3d 184, 189 (1st Cir. 2003) (cleaned up). "The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'" *Id.* (cleaned up). "In order to determine both when a pre-deprivation hearing is compulsory and what process is due, an inquiring court must balance a myriad of factors, including the private and public interests involved, the risk of an erroneous deprivation inherent in the procedures employed by the state, and the likely benefit that might accrue from additional procedural protections." *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (citing *Eldridge*, 424 U.S. at 335).

Here, Fusion received constitutionally adequate notice regarding its First Application. While it is true that Fusion received the March 2019 Report the morning of the March 21, 2019 ASC meeting, significantly, no vote was taken on Fusion's First Application at that time. Furthermore, this is not a case where Fusion received the April 2019 Report a couple hours beforehand; Fusion had close to 24 hours to review the April 2019 Report. *Compare Melville v.*

*Town of Adams,* 9 F. Supp. 3d 77, 107 (D. Mass. 2014) (Plaintiff sufficiently alleged she did not receive adequate process where "[t]he Board only notified Plaintiff of an emergency hearing only two hours beforehand" and "the notice included no information regarding the substance of the allegations."). The larger context remains the following: weeks prior, the ASC provided to Fusion the March 2019 Report, which includes an overview and concerns pertaining to Fusion's First Application, Fusion representatives spoke and answered the ASC's questions in the March 21, 2019 Meeting regarding the First Application, and Defendants informed Fusion that its First Application was on the agenda for vote at least 48 hours prior to the scheduled April 11, 2019 meeting. Taken together, Fusion received constitutionally adequate notice regarding its First Application.

Fusion also argues it was not provided a fair and impartial hearing on its First Application. Rather, at the outset, Dr. Berman had already decided that Fusion's application would be denied as evidenced by communications he sent to the Newton and Burlington school superintendents prior to the March 21, 2019 meeting. Additionally, members of the ASC revised the April 2019 Report to support Trach's recommendation against approval despite the ASC stating they had not yet had a chance to discuss the April 2019 Report. In contrast, Defendants argue Fusion was allowed to and did present written applications of its own making and choosing to the ASC, and five Fusion officials spoke on behalf of Fusion's application without interruption at the April 2019 Meeting.

"[The Supreme] Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews*, 424 U.S. at 333. Here, it is uncontested that at the April 11, 2019 Meeting, five members of Fusion spoke on Fusion's behalf for approximately twenty minutes. However, it is also true that Trach was privy to

31

communications between Superintendent Dr. Berman, ASC's then counsel, and Assistant

Superintendent Stetson that indicated disapproval of Fusion at the outset and more significantly,

that members of the ASC revised the April 2019 Report to support Trach's recommendation

against approval before the vote. "A plaintiff who can show that 'the decision has already been

made and any hearing would be pro forma and meaningless is entitled to go forward with a due

process claim.'" *Novoa v. Burset*, No. 09-cv-1355, 2012 WL 4508004, at *11 (D.P.R. Aug. 13,

2012), report and recommendation adopted sub nom. *Marti-Novoa v. Fortuno-Burset*, No. 09-cv-

1355, 2012 WL 4511531 (D.P.R. Sept. 28, 2012) (cleaned up). Here, the uncontested facts

preclude a definitive answer to whether Fusion was given a meaningful opportunity to be heard

on its First Application.

### b.  **Fusion's Second Application**[10]

Fusion argues it was deprived of a meaningful opportunity to be heard at the March 18,

2021 Meeting and the March 25, 2021 Meeting because Fusion was limited to addressing the

2021 Recommendation during the public comment session at the start of the meetings and before

agenda items came up for discussion. According to Fusion, its representatives could not present

their own evidence during the discussion of their application; they could not correct many

misstatements by Trach and others, and; they could not exercise those rights that due process

makes mandatory. Fusion also argues that none of those rights would have mattered given that

the outcome had been pre-determined. On the other hand, Defendants argue that during a virtual

---

[10] With regard to its Second Application, Fusion only mentions that it received the March 2021
Recommendation about 30 hours prior to the March 25, 2024 meeting, and that on the afternoon of March
23, 2021, Fusion's application was listed as a vote item. To the extent Fusion argues lack of notice,
Fusion had at least 24 hours to review the March 2021 Report, which was constitutionally sufficient.
*Compare Melville v. Town of Adams,* 9 F. Supp. 3d 77, 107 (D. Mass. 2014) (Plaintiff sufficiently alleged
she did not receive adequate process where "[t]he Board only notified Plaintiff of an emergency hearing
only two hours beforehand" and "the notice included no information regarding the substance of the
allegations.").

meeting of the ASC on March 18, 2021, Trach provided the ASC with a 15-minute discussion of her findings and noted that a written summary would be forthcoming. The ASC did not vote but, instead, continued its discussion of Fusion's Second Application to the next School Committee meeting on March 25, 2021. Hence, Fusion had at least a week to respond to Trach's verbal report to the ASC and submit any additional materials that Fusion thought warranted. Furthermore, during the "Public Input" portion of the ASC Meeting on March 25, 2021, Van Dinther and Houlihan again spoke on Fusion's behalf.

Again, the uncontested facts preclude a definitive answer to whether Fusion was given a meaningful opportunity to be heard on its Second Application. Fusion was provided with an opportunity to speak on behalf of themselves at the April 11, 2021 meeting. And although Fusion was limited to the public comment session of the meeting, Fusion had at least a week to respond to Trach's verbal report to the ASC on March 18, 2021. However, there are sufficient facts to demonstrate disapproval of Fusion's Second Application from the outset – including, that at least two ASC members who revised the April 2019 Report prior to vote of the First Application also voted against the Second Application. Furthermore, Superintendent Dr. Bach's email to Trach on January 23, 2021 could lead a jury to believe there was disapproval at the outset. *See Lawless v. Town of Freetown*, No. 18-CV-11089, 2023 WL 7619019, at *6 (D. Mass. Nov. 14, 2023) (Plaintiff allowed to proceed where evidence at summary judgment was sufficient for a reasonable jury to find that "the outcome of the hearing was predetermined and therefore violated [Plaintiff's] due process rights.").

In sum, Fusion alleges that it was denied a meaningful opportunity to be heard prior to the ASC's decision. Although there were communications and meetings with school officials, Fusion contends that it was not advised of the criteria that would control the decision, nor

provided an opportunity to address the final concerns before the vote. A meaningful opportunity to be heard requires more than formal proceedings—it requires that the applicant be given a real chance to understand and respond to the basis for the governmental decision. The record, viewed in the light most favorable to Fusion, shows unresolved factual questions as to whether the ASC afforded such an opportunity.

### 4. Disinterested Decisionmakers

Fusion argues that the decisionmakers lacked neutrality, specifically that Trach relied on both Dr. Berman and ASC's then counsel who were clearly hostile to Fusion. It points to the following: that (1) in April 2018, Dr. Berman expressed the hope that Fusion would just go away; (2) in October 2018, he and Scully chose not to change the ASC Policy in case Fusion sued; (3) on June 19, 2019, Dr. Berman told a Fusion representative that he was worried about special education students going to Fusion and diverting dollars from Andover Public Schools to Fusion; (4) in mid-2020, Dr. Berman assured his subordinate, Trach, that he had no intention of recommending Fusion for anything; (5) Dr. Berman told a Rotary Club gathering that, regardless of changes, the Second Application would not be approved; and (6) Trach's job, according to her, was to follow the direction of the superintendent.

Defendants argue that the actual decisionmaker did not base its decision to deny Fusion's applications on any potential diversion of funds from Andover. According to Defendants, there is no evidence that any of the members of the ASC – let alone a majority of the ASC – were concerned about possibly losing "some [undetermined] funding provided under the IDEA ["Individual with Disabilities Education Act"]," should Fusion be approved by the ASC.

"Reasonable persons generally come to understand—instinctively as much as inductively—that the impartiality of decisionmakers is a basic precept of a fair process." *Lawless*

*v. Town of Freetown*, 63 F.4th 61, 67–68 (1st Cir. 2023). However, "even when it comes to judicial officers, the constitutional threshold for disqualifying personal bias is not clearly established." *Lawless*, 63 F.4th at 68. Furthermore, "[a] person who investigates and presents an agency's case, unlike a decisionmaker, does not have to be neutral." *Gonzalez-Droz*, 660 F.3d at 15; *see also Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248 (1980).

The parties agree that during Fusion's First Application, direct contact with Fusion for the review process was delegated to Trach under the direction of Superintendent Berman, and that during the majority of the Second Application, the review process was handled by Trach with Dr. Bach as superintendent. However, neither Trach, Dr. Berman nor Dr. Bach ultimately made the decision to accept or reject Fusion's applications. As such, Dr. Berman, Dr. Bach, Trach, and ASC's then counsel's actions are insufficient by themselves to show that Fusion's applications were denied due to biased decisionmakers. Furthermore, at this stage, there are insufficient facts in the record for the Court to determine that the ASC decided to reject Fusion's applications for a potential loss of IDEA funding. However, the record reflects internal emails showing ASC members modifying evaluative materials and sharing opinions about Fusion's model in advance of the public vote, and at least three members of the ASC revising the April 2019 Report to support Trach's recommendation against approval before the vote. At least two of these members remained with the ASC during the Second Application. Fusion also cites the Open Meeting Law violation identified by the Massachusetts Attorney General's Office as evidence of pre-judgment and coordination outside public scrutiny. The presence of a disinterested decisionmaker is a core requirement of procedural due process. Whether Fusion was denied this right presents a fact dispute precluding summary judgment.

Accordingly, Plaintiff's motion for summary judgment and Defendants' cross-motion for summary judgment on the procedural due process claim are <u>DENIED</u>.

### C.    <u>First Amendment Right To Academic Freedom</u>

Fusion asserts that the ASC's denial of its private school application violated its First Amendment right to academic freedom. Specifically, Fusion argues Trach surpassed her purview by telling Fusion how to teach. For example, Trach critiqued student learning times, Fusion's licensure of teachers, and the amount of live versus asynchronous teaching time. Defendants cross-move for summary judgment arguing that this Court need not dive into the unsettled waters of academic freedom because Fusion's First Amendment claim is foreclosed by the testimony of its own senior executives and not one member of the ASC made a comment even remotely touching upon the four essential academic freedoms. Even if protected, they argue that the ASC's decision was content-neutral and reasonably related to the legitimate goal of ensuring educational adequacy. They maintain that Fusion's lack of licensed staff, guidance services, and traditional curriculum were the true bases for denial.

While the Supreme Court has not explicitly defined the contours of institutional academic freedom in the K–12 context, Fusion relies on precedents recognizing a constitutional interest in educational autonomy. *See Keyishian v. Board of Regents*, 385 U.S. 589 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957). "Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 143 (D. Mass. 2021) (cleaned up). "The 'four essential freedoms' are 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" *Id.* (cleaned up).

36

"[P]rivate schools have a First Amendment right to academic freedom," but the state has the right and power "to promulgate reasonable regulations affecting private secondary schools to ensure that minimum education standards are met." *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla,* 490 F.3d 1, 11 (1st Cir. 2007). Furthermore, "the right to academic freedom in secondary education is necessarily more circumscribed than that of a university." *Garcia-Padilla*, 490 F.3d at 11 n.6. "Still, 'the discretion of the States and local school boards must be exercised in a manner that comports with the transcendental imperatives of the First Amendment.'" *Id.* (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 864 (1982)). To establish a First Amendment violation, Fusion must show (1) that its proposed educational expression or pedagogical content constituted protected speech, and (2) that the government suppressed or burdened that expression without sufficient justification.

Both parties agree that Defendants' decisions to deny Fusion's applications are content neutral and subject to intermediate scrutiny. *See Garcia-Padilla*, 490 F.3d at 15 ("[R]egulations intended to serve purposes unrelated to content of the regulated speech, despite their incidental effects on speech, expression, or message are subject to intermediate scrutiny."). "Where the challenged regulation is indirect and content-neutral, the question of whether the incidental burdens on speech or academic freedom trigger a First Amendment claim is a fact-sensitive one." *Asociación de Educación Privada v. Echevarría-Vargas,* 385 F.3d 81, 87 (1st Cir. 2004).

Here, Defendants identified differences between Fusion and Andover Public Schools in hours of direct instruction, teacher training levels, and covered prescribed subjects of instruction in considering denial of Fusion's applications. Such exercise of discretion comports with the First Amendment. *See Bd. of Ed. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 245–46 (1968) ("[A] substantial body of case law has confirmed the power of the States to insist that attendance

at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction."); *see also Care & Prot. of Charles,* 399 Mass. at 332 ("The school committee may make all reasonable rules and regulations for the government, discipline and management of the schools under their charge. This includes a determination within the bounds set by the statutes of the subjects to be taught and the nature of the schools to be maintained and the exercise of discrimination, insight and wisdom in the election of teachers and in the general supervision of the school system, with all the incidental powers essential to the discharge of their main functions."). Thus, Fusion's Motion pertaining to its First Amendment claim is DENIED and Defendants' Motion is GRANTED.

### D.   ADA Claim

Defendants contend that Fusion lacks standing to bring an ADA claim because it is not itself a disabled individual and has disclaimed any intent to operate as a specialized disability-serving institution. They argue that no specific student with a disability was denied access or services, and that their decision did not prevent disabled individuals from receiving education in public or other approved private schools. Defendants further argue that Fusion's complaint fails to allege the type of exclusion or discriminatory treatment contemplated under the ADA. They characterize the ASC's decision as a legitimate application of its authority to assess educational adequacy under M.G.L. c. 76, § 1, independent of disability-based considerations.

"To establish standing under Article III of the Constitution, a plaintiff must show injury that can be fairly traced to the challenged conduct and that is likely to be redressed by a favorable decision." *Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 33 (1st Cir. 2019). "These requirements ensure that plaintiffs have a stake in the outcome that

38

is sufficiently concrete and personal to maintain a justiciable case or controversy." *Id.* However, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Id.* (cleaned up).

Fusion states it would be open to students with disabilities, and that Defendants indicated that Fusion's application would not be approved on that basis because the funding provided pursuant to IDEA for students with disabilities could be reallocated away from the Town to Fusion. The First Circuit has held that "the nature of this type of claim and of the relief sought requires the participation of individual members" and is thus inappropriate for prudential reasons. *Id.* (cleaned up). Significantly, Fusion has not identified any students who would have individual standing were they to bring suit. Fusion only states its schools did admit students with disabilities and would do so in Andover, which is insufficient to establish standing. *See Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 320 (D. Mass. 1997) (Representative standing is insufficient where Plaintiffs do not allege that members are suffering immediate or threatened injury because of the challenged action that would have shown a justiciable case had the members themselves brought suit.).

Fusion argues that Defendants' standing argument was rejected at the motion to amend stage. Granting leave for the ADA claim to proceed did not determine the legal issue of whether Fusion has standing. Furthermore, Fusion improperly argues "any person alleging discrimination" in violation of Title II has the remedies and rights provided by § 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 795(a)(2) citing *Habit Mgmt., Inc. v. City of Lynn*, 235 F. Supp. 2d 28 (D. Mass. 2002). In *Habit Mgmt., Inc.*, the court found a violation of the ADA where a zoning ordinance effectively precluded any methadone clinics in the city, facts very different from this case. *Id.* The Court refuses to expand the bounds of representative standing as Fusion

39

suggests. As such, Defendants Motion for Summary Judgment on Fusion's ADA claim is

ALLOWED.

### E.    Declaratory Judgment Pursuant To 28 U.S.C. § 2201

Defendants also seek to dismiss Fusion's claim that it is entitled to a declaration that its

applications satisfied the requirements of M.G.L. c. 76 § 1. Defendants argue that Fusion's

request for declaratory relief was disposed of in Judge Saris' Memorandum and Order on Motion

to Dismiss, [Doc. No. 30]. Fusion does not dispute this. Thus, the Court reaffirms dismissal of

Fusion's request for declaratory relief pursuant to 28 U.S.C. § 2201 to the extent it raises a state-

law claim. *Fusion Learning, Inc. v. Andover Sch. Comm.*, 609 F. Supp. 3d 5, 16 (D. Mass. 2022).

### F.    Motions To Strike

#### 1.    The Carter Report

On January 15, 2024, Fusion disclosed reports from Carter Research, LLC, including

three reports titled "Program Evaluation of the Educational Model," "The Benefits of 1:1

Learning," "Carter Research, DESE Regulations" (collectively, the "Carter Report"). Defendants

move to strike the Carter Report submitted by Fusion in support of its Motion for Partial

Summary Judgment. In support, Defendants argue the Carter Report seeks to second guess

Trach's recommendations and the ASC's vote to not approve the two applications by offering

information that was not introduced to either party during the application and approval process

and was only prepared as a result of this litigation.

The Court has reviewed The Carter Report and finds that to the extent it discusses

Trach's recommendation that Fusion Academy would not satisfy M.G.L. c. 76 § 1, the efficacy

of 1:1 learning, and whether Trach appropriately used DESE regulations in making her two

recommendations, it is not relevant to the issues at hand. None of the claims asserted by Fusion

require proof of the accuracy of Trach's findings or the efficacy of Fusion's teaching models. Because the Court does not rely upon the Carter Report in resolving summary judgment, the Defendants' Motion is <u>DENIED</u> without prejudice to renew as a motion in limine before trial.

### 2. References To The 2018 Education Impact Report And Student Surveys

Defendants also seek to strike references to student surveys and the 2018 Education Impact Report. For similar reasons, because the Court does not rely upon the 2018 Education Impact Report and Student Surveys in resolving summary judgment, the Defendants' Motion is <u>DENIED</u> without prejudice to renew as a motion in limine before trial.

## IV.    CONCLUSION

For the above reasons, Plaintiff's Motion for Summary Judgment is <u>DENIED</u>. Defendants' Motion for Summary Judgment is <u>GRANTED</u> as to the First Amendment and ADA claims and is otherwise <u>DENIED</u>. Defendants' Motions to Strike are <u>DENIED</u> without prejudice subject to renewal as Motions in Limine before trial.


SO ORDERED.

<u>/s/ Myong J. Joun</u>
United States District Judge
